MATTER OF STOJKOVIC

In DEPORTATION Proceedings

A-12885583

*Decided by Board June 4, 1963*

Respondent, a 30-year-old native of Yugoslavia and national of the Dominican Republic, has not established that because he was an officer in the Anti-Communist Foreign Legion organized in the Dominican Republic under Trujillo's dictatorship he would be subject to physical persecution within the meaning of section 243(h), Immigration and Nationality Act, if deported to that country.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Entry as nonimmigrant, remained longer.

Respondent was an officer in the Anti-Communist Foreign Legion organized in the Dominican Republic under Trujillo's dictatorship. He maintains that this former connection with the Trujillo regime would subject him to physical persecution in the Dominican Republic. On this ground he applies for withholding of his deportation to that country.[1]

The special inquiry officer denied respondent's application and ordered deportation to the Dominican Republic. Respondent appeals from that denial. We must determine whether respondent's connection with Trujillo would subject him in the Dominican Republic to hardship which would amount to the physical persecution the statute contemplates.

Respondent raises several points meriting close consideration. The nebulous elements in the overall factual situation render difficult an objective assessment of the likelihood of physical persecution. Respondent's counsel points out that the special inquiry officer referred in his opinion to a valid principle of law but applied it erroneously to respondent's case. Technically, at least, respondent is correct on this point. Nevertheless, upon close analysis of the whole record, we reach the opinion that respondent would not now face physical persecu-

---

[1] Section 243(h), Immigration and Nationality Act, 8 U.S.C. 1253(h).

tion if deported to the Dominican Republic. Our decision, therefore, coincides with that of the special inquiry officer.

Respondent is a native of Yugoslavia, 30 years old, and single. The Trujillo regime granted him Dominican nationality. Respondent left the Dominican Republic on March 7, 1962 and arrived at Miami, Florida that same day, entering the United States as a nonimmigrant purportedly in transit to France. His authorized stay in this country expired on March 9, 1962. Respondent admits that he entered this country intending not to continue his journey to France. The order to show cause, however, charged him only with overstaying his authorized time. He concedes deportability on that charge. Respondent declined to apply for voluntary departure or to designate a country to which his deportation should be directed.

Respondent states that he left Yugoslavia in 1956 because he did not want to live under the Communists. He resided in France until 1959. In that year he signed a contract with the Dominican Republic's representatives in France for employment in the Dominican Republic. Upon his arrival there, instead of employment pursuant to the agreement, he was ordered into military service. Respondent testified that he objected to military service but accepted the offer after notification the alternative to serving in the military forces was imprisonment. He subsequently attained the rank of first lieutenant.

In 1960 when Trujillo disbanded the Anti-Communist Legion, respondent transferred to a mountain regiment under the command of Vladimir Secen, then a lieutenant colonel. Respondent remained in military service until June 1, 1961, just after Trujillo's death. Colonel Secen, who had also been respondent's commanding officer in the Anti-Communist Legion, appeared as a witness for respondent.

This record suggests three possible sources for respondent's physical persecution in the Dominican Republic—imprisonment, deportation, or mob violence. We shall discuss in the order given each of these sources from two points of view—respondent's actual experiences while in the Dominican Republic and his probable experiences if returned to that country.

### I. Respondent's actual experiences in the Dominican Republic

#### 1. Imprisonment

Respondent's activities immediately following termination of his military service are not clear. He testified he was arrested twice, once in November 1961 and again on December 26, 1961. He was imprisoned the first time for about eight days and the second until February 7, 1962. Respondent said he was arrested because he was considered a good friend of Trujillo. He also said the charges were

using arms without a permit, although he was then an army officer required to wear arms, and being a Trujillo mercenary. Respondent alleges that he was mistreated in jail but does not describe any abuse. Even if respondent's arrests had a purely political basis, his imprisonments—in view of their relatively short duration and the lack of evidence of actual mistreatment—cannot be held to have constituted physical persecution for purposes of the statute.

## 2. Deportation

The record does not show whether respondent was actually deported from the Dominican Republic. He testified that shortly after his release from prison in February 1962 he was taken one night to army intelligence headquarters. The authorities picked up his passport at that time and returned it to him the day before he left the Dominican Republic. When respondent was about to depart, the authorities told him he would be able to travel to France and gave him a ticket for air transportation to that country. Such facts are as consistent with an intention to make some restitution under the breached contract of employment by returning respondent to France, the country in which the contract was executed, as they are with an intention to deport respondent. We shall assume respondent's deportation from the Dominican Republic, however, in order to consider for our purposes its possible effect.

The special inquiry officer refers to the legal principle that a sovereign state has a right to deport undesirable persons. Counsel for respondent points out that that principle refers to aliens and does not apply to a national of the country.[2] He asserts that deportation of a national from his own country is a most insidious form of physical persecution cutting him off from friends, family, economic resources, language, and culture.

Deportation of a national is akin to banishment or exile. Historically banishment has been recognized at times as a punishment and at other times as a conditional pardon. The latter concept prevailed in England where banishment was first known as "abjuration." The accused party took an oath to leave the realm and to return only with permission. This was a conditional pardon rather than punishment.[3]

---

[2] The special inquiry officer refers to *Lopez* v. *Howe*, 259 F. 401 (C.A. 2, 1919), a case of an alien. In *U.S.* v. *Ju Toy*, 198 U.S. 253 (1905) the appellee claimed United States nationality. The Court, however, three justices dissenting, accepted the administrative officials' finding of alienage and considered the writ of habeas corpus on that basis.

[3] 8 C.J.S. p. 593 (1962).

Whether imposed as punishment or a condition for a pardon banishment has usually been attended with loss of civil rights.[4]

Respondent has retained his Dominican nationality and the right to travel on a Dominican passport. In the absence of any evidence to the contrary, we assume that he has also retained any other civil rights which attach to Dominican nationality. There is no evidence indicating respondent is likely to be denaturalized. His case, therefore, is more akin to "relegation" in old English law, or *relegatio* of the Roman civil law, a modified type of banishment (temporary in England) in which the person retained his rights of citizenship.[5]

Moreover, respondent testified that he requested permission to leave the Dominican Republic in lieu of remaining there in military service. He was being returned to France, the country from which he had entered the Dominican Republic and in which he had sought refuge after leaving Yugoslavia. Under his theory that his deportation from the Dominican Republic—if he was deported—constituted physical persecution, his present sojourn in this country must be a form of physical persecution. His efforts to remain here in lieu of going to any other country, including the Dominican Republic or France, militate against such a view of his case.

Respondent's ties in the Dominican Republic are slight. The record does not disclose that respondent has friends, family, or economic resources in the Dominican Republic. Respondent himself testified that the Dominican officers serving in the Army under Trujillo looked upon him as a foreigner, an alien. Therefore, the special inquiry officer's position although technically inaccurate, is not so far wrong in substance. Only if respondent's ties in the Dominican Republic were so strong as to make enforced absence from that country severe and unusual hardship might his deportation, or banishment, from the Dominican Republic constitute physical persecution. For the foregoing reasons we conclude that even assuming respondent's departure from the Dominican Republic was equivalent to deportation, he has not suffered physical persecution thereby.

### 3. Mob Violence

Information in the record (Ex. 3) indicates the Anti-Communist Legion was used to oppose the attempted invasion of the Dominican Republic in 1959 by Dominicans seeking to overturn the Trujillo regime. Such activity, even though coerced, no doubt adds to any

---

[4] Black L.D., Rapalje and L.L.D. For a discussion of some modern instances of banishment with historical references see Armstrong, *Banishment: Cruel and Unusual Punishment*, 111 U. Pa. L. Rev. 758 (April 1963).

[5] Black L.D., Rapalje and L.L.D.

unpopularity in the Dominican Republic of former members of the Anti-Communist Legion resulting from their association in general with the Trujillo regime. Respondent has referred vaguely to an inability to move freely about the streets in the Dominican Republic. We believe these allegations reflect fear of mob action. His witness, Secen, also referred to danger from the mobs. Respondent cites no occurrence, however, in which he had any particular difficulty with a mob in the streets of the Dominican Republic. We find in this record no evidence that he has suffered physical persecution in the Dominican Republic from that source assuming, without deciding, that the statute contemplates physical persecution can arise from such a source.[6]

We conclude from the discussion thus far of respondent's suggested sources of physical persecution—imprisonment for a political offense, deportation or banishment, and mob violence—that respondent did not undergo any physical persecution while residing in the Dominican Republic. But what if respondent were now to be returned to the Dominican Republic?

## II Respondent's probable experiences if returned to the Dominican Republic.

The likelihood that respondent will encounter physical persecution in the Dominican Republic can be founded only upon existing circumstances in that country. We take official notice that the executive leaders of the Dominican Republic's Government have changed since respondent's hearing. So far as we can ascertain at this time, however, this change has no material effect in our consideration of respondent's case. If anything there is less internal tension, at least on the surface, then there was at the time the special inquiry officer heard respondent's case.

### 1. Imprisonment

Respondent testified the authorities informed him that if he returned to the Dominican Republic he would again be imprisoned. As a mercenary during Trujillo's dictatorship, even though an unwilling one, respondent would no doubt be unpopular with many segments of the population as well as some individuals within the Government. Respondent's position in that regime, however, was not of a type or significance likely to now cause lengthy imprisonment or unduly harsh treatment while confined. We believe that respondent's confinement, if any, would be relatively brief—as were his prior imprisonments.

Counsel for respondent mentioned in his memorandum on appeal that he knows from personal observation that the treatment accorded

---

[6] Compare *Matter of Diaz*, Int. Dec. No. 1270 (March 20, 1963).

political prisoners in respondent's country is not according to our standards of treatment of prisoners. There is no evidence in the record in support of this statement, however, and, in particular, no evidence that the treatment is such that confinement for even a brief period of time might constitute physical persecution. Moreover, there is no reason to suppose that the Dominican authorities would not again permit respondent to leave the country, especially in lieu of serving a lengthy term in prison.

## 2. Deportation

Failing respondent's departure from the country at his own request, the authorities might on their own initiative take steps to expel him.[7] Respondent contends both that expulsion would be likely to occur and that it would constitute physical persecution. The special inquiry officer admits that respondent might be deported from the Dominican Republic. We concede a fairly high degree of probability for such an eventuality. For the reasons discussed in considering the circumstances under which respondent left the Dominican Republic in May 1962, however, we believe respondent's expulsion from that country would not constitute physical persecution.

## 3. Mob violence

Respondent says that the communistic 14th of June party persecutes anyone who had belonged to the Anti-Communist Legion. The record does not specify what form such persecution might take. That party has not had control of the Government at any time. Probably respondent believes that the party's adherents would, without governmental sanction, attack former Legionnaires.

Respondent makes no direct allegation that he would suffer physical harm at the hands of rioting or demonstrating mobs in the Dominican Republic. The special inquiry officer states respondent's position is basically that the current Government in the Dominican Republic would physically persecute him because of his military employment by the Trujillo regime. Respondent's counsel does not take exception to that statement. He frames the issue more broadly, however, in terms of whether the respondent will receive treatment in the Dominican Republic which will constitute physical persecution—without specifying whether such treatment would come from the Government or some other source. Thus we do not have sharply defined here the issue raised, but not determined, in *Matter of Diaz*—whether physical harm inflicted upon a person by a mob acting without governmental

---

[7] The record is silent as to Dominican law empowering such action.

sanction, can constitute physical persecution for the purposes of section 243 (h) of the Immigration and Nationality Act.[8]

As we have noted, however, respondent testified that he could not walk in the streets. His witness, Vladimir Secen, testified that his own troubles were with Communist controlled groups on the streets. Latent in respondent's situation, therefore, lie the queries whether a mob in the Dominican Republic might physically harm him and, if so, whether such harm would amount to physical persecution for purposes of the statute.

Respondent's case, insofar as mob violence might be involved, corresponds to what we designated as the first situation in *Diaz*. We there reserved the question pertaining to that situation—whether intentional physical harm inflicted because of past association with the Trujillo regime or because of antithetic interests by a riotous mob, acting without the sanction of the Dominican Government, would amount to physical persecution within the meaning of section 243 (h). We again find that we need not consider the legal import of this question.

Respondent submitted no evidence to corroborate his bare statement that he would not be able to go out on the streets. The Dominican newspaper clipping which refers to deportation of four persons from the Dominican Republic (Ex. 3) is an ordinary news item which makes no reference to any particularly inflammatory public action or opinion. Moreover, there is no evidence that the authorities could not adequately protect respondent by controlling any outbursts of mob violence which might appear. Instances of mob violence in the Dominican Republic have diminished. We believe that respondent is not likely to suffer harm from such a source.

We conclude that respondent is not likely to encounter in the Dominican Republic any treatment which would warrant withholding his deportation to that country on the grounds that he would be physically persecuted there and dismiss the appeal.

**ORDER:** It is ordered that the appeal be and hereby is dismissed.

---

[8] Supra.