**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1419
_____

EDIL JOEL GALEAS FIGUEROA,
                              Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                              Respondent
_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(A200-597-380)
Immigration Judge:  Honorable Daniel A. Morris
_____

Argued:  January 13, 2020

Before:  HARDIMAN, PORTER, and PHIPPS,
*Circuit Judges*.

(Filed: May 19, 2021)

Raechel K. Kummer          **[Argued]**
Susan B. Manning
MORGAN LEWIS & BOCKIUS
1111 Pennsylvania Ave., N.W.
Suite 800 North
Washington, DC 20004

Stephanie R. Reiss
MORGAN LEWIS & BOCKIUS
301 Grant Street
One Oxford Centre, Suite 3200
Pittsburgh, PA 15219

      *Counsel for Edil Joel Galeas Figueroa*


Anjum Gupta
RUTGERS UNIVERSITY SCHOOL OF LAW
123 Washington Street
Newark, NJ 07102

      *Counsel for Amicus Petitioners Immigration
      Law Professors*

Jenny C. Lee        **[Argued]**
UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
P.O. Box 878
Ben Franklin Station
Washington, DC 20004

> *Counsel for Attorney General United States of America*

———————

OPINION OF THE COURT
———————

PHIPPS, *Circuit Judge*.

Edil Joel Galeas Figueroa petitions for relief from a final order of removal following his second illegal entry into the United States. To prevent deportation to his native Honduras, Galeas Figueroa seeks withholding of removal under both the Immigration and Nationality Act and the Convention Against Torture, asserting that he would be persecuted and tortured by a gang that raped his sister, killed his relatives, and threatened him and other family members.

On administrative appeal, the Board of Immigration Appeals affirmed a decision by an Immigration Judge denying Galeas Figueroa the relief he seeks. As to statutory withholding, the BIA determined that the violence and threats by the gang did not amount to governmental persecution, but rather constituted private harm for which withholding of removal under the INA is unavailable. In reaching that

3

outcome, the BIA treated as interchangeable two legal standards for evaluating the degree of governmental culpability in the harmful conduct of private actors: the unable-or-unwilling-to-control test and the condone-or-complete-helplessness test. With respect to CAT protection, the BIA concluded that the Honduran government would not acquiesce to any torture that Galeas Figueroa might experience because Honduran police would investigate reports that Galeas Figueroa would make.

Galeas Figueroa petitioned this Court to review the BIA's final order of removal. He moved for a stay of removal for the pendency of his petition, and this Court denied his motion. Then, according to the Government, Galeas Figueroa did not report to governmental custody as ordered. Invoking the fugitive disentitlement doctrine, the Government moved to dismiss Galeas Figueroa's petition.

Upon consideration of the Government's motion and Galeas Figueroa's petition, we will deny both. Galeas Figueroa may well be a fugitive disentitled to relief, but the Government's evidence of his fugitive status is insufficiently probative to justify discretionary dismissal of his petition. As to the BIA's denial of Galeas Figueroa's application for statutory withholding of removal, the agency did not err in treating the unable-or-unwilling-to-control test and the condone-or-complete-helplessness test as legal equivalents. And substantial evidence supports its conclusion that Galeas Figueroa did not demonstrate the requisite connection between the gang's harmful acts and the Honduran government. Nor was the BIA's denial of CAT protection unsound. Substantial evidence supports its conclusion that Honduran police would

4

investigate reports from Galeas Figueroa, and thus he failed to establish governmental acquiescence to torture.

## I. BACKGROUND

Galeas Figueroa, a native and citizen of Honduras, has twice entered the United States unlawfully. His explanation for doing so unfolds in greater detail with each successive telling.

### A. *Galeas Figueroa's Illegal Entry in 2010*

In 2010, Galeas Figueroa entered the United States without inspection or parole. In his initial interview with a border patrol agent, Galeas Figueroa stated that he had come to the United States to obtain work in New Jersey and that he had no fear of returning to Honduras. But not long after his entry, during a credible-fear interview with an asylum officer, *see* 8 C.F.R. § 1208.30, Galeas Figueroa stated that his father, uncle, and some cousins were killed in Honduras and that he feared their killers would also kill him. Though he professed not to know the assailants or their motives, he reported that his father had previously received death threats and surmised that gang members had targeted his family out of envy or jealousy. Galeas Figueroa also noted that he and his father were members of a farmers' organization, but he did not believe that the people who killed his father would want to harm other members. From that information, the asylum officer concluded that Galeas Figueroa had a credible fear of persecution.

During removal proceedings, Galeas Figueroa applied for asylum and statutory withholding of removal under the INA.

5

Through his application and testimony, Galeas Figueroa supplied several additional details. He indicated that a rival farmers' organization seeking to seize his father's land killed his father. Galeas Figueroa also testified that his father was killed for previously reporting to the police his sister's rape by gang members. He further explained the killings of his uncle and his two cousins: his uncle was killed at the same time as his father, and his cousins were killed to prevent them from retaliating against the killers. Galeas Figueroa revealed that after his father's death, he fled to another part of Honduras and after receiving death threats, to the United States. The Immigration Judge ultimately concluded that Galeas Figueroa was not entitled to relief, denied his application, and ordered him removed. Galeas Figueroa waived any appeal and was removed to Honduras the following week.

## B. Galeas Figueroa's Illegal Entry in 2012

After remaining in Honduras for approximately one year, Galeas Figueroa reentered the United States in 2012. He came with his longtime girlfriend but not his children. They lived undetected in New Jersey for several years, but in late 2017, the Department of Homeland Security reinstated Galeas Figueroa's prior removal order.

During a reasonable-fear interview, *see* 8 C.F.R. § 1208.31, Galeas Figueroa again expressed fear of returning to Honduras. This time, he attributed the deaths of his family members to either the Mara 18 gang or the MS-13 gang. He explained that one of those gangs raped his sister, and after his father reported the assault to the police, the gang killed his father (and his uncle) in retaliation. As told by Galeas Figueroa, that sequence of events repeated with his cousins. After one cousin reported

6

his father's and uncle's murders to the police, the gang killed him. And after another cousin reported the first cousin's murder, the gang killed him as well. Galeas Figueroa informed the asylum officer that the gang then turned their attention to him, threatening to kill him for trying to protect his father from the gang but never physically harming him. The asylum officer found Galeas Figueroa to be credible and referred him for a withholding-only hearing before an Immigration Judge. *See* 8 C.F.R. 1208.31(e).

At that hearing, Galeas Figueroa applied for withholding of removal under the INA and the CAT.[1] In testifying again about events that occurred in Honduras before his first illegal entry, Galeas Figueroa was no longer uncertain about who had harmed his family and threatened to kill him – it was the Mara 18 gang. Galeas Figueroa ascribed several motives to the gang's murder of his father: his father reported to the police that gang members raped his sister; his father tried to protect another woman who was raped by the gang; his father participated in a farmers' organization (which, as Galeas Figueroa reported, was a rival of another organization comprised of gang members); and his father was involved in anti-gang political activities. Galeas Figueroa also added another previously omitted detail – in addition to threatening to kill him for taking care of his father, the gang once beat him on the back with a belt buckle. Galeas Figueroa stated that he did not inform the Immigration Judge at his prior hearing about

---

[1] Galeas Figueroa conceded that he was statutorily ineligible for asylum due to the denial of his prior asylum application and his reinstated removal order. *See* 8 U.S.C. §§ 1158(a)(2)(C), 1231(a)(5).

7

everything that had happened to him because he feared retaliation from the gang.

Galeas Figueroa also described other later-in-time developments. He alleged that the Mara 18 gang continued to threaten him and his family, including threatening to cut out his brother's tongue. He also testified that the gang called twice (first his mother and then him directly) with death threats after his 2011 removal to Honduras.

Those threats prompted Galeas Figueroa to enter the United States again in 2012. After his arrival, Galeas Figueroa learned from his mother in Honduras that the gang shot at their house and killed his dog. And later, in 2014, the gang phoned Galeas Figueroa and threatened to kidnap his children in Honduras unless he paid a ransom. Rather than pay the gang, Galeas Figueroa's mother brought the children to the United States. Since that time, neither Galeas Figueroa nor his mother (who returned to Honduras) has received any threats from the gang.

Galeas Figueroa also submitted evidence to show that the Honduran government could not and would not protect him from the gang. He produced police reports that had been filed concerning his sister's rape, his family members' murders, and the threatened kidnapping of his children. He also testified that those reports never resulted in any arrests and that the Honduran police were allied with the gang.

Following the hearing, the Immigration Judge determined that Galeas Figueroa was not entitled to withholding of removal under the INA or the CAT. The Immigration Judge invoked res judicata and collateral estoppel to prevent relitigating any issues resolved at his first removal hearing.

8

And considering only the events that occurred after his first removal, the Immigration Judge found that, although Galeas Figueroa was credible, he had not suffered past persecution. The Immigration Judge nonetheless found that Galeas Figueroa faced a clear probability of future harm in Honduras due to his membership in a particular social group (his father's family). However, because Galeas Figueroa did not demonstrate that such harm from private actors would constitute persecution or torture, he was ineligible for relief from removal.

Galeas Figueroa administratively appealed that decision to the BIA. *See* 8 C.F.R. § 1003.1(b)(3). Unlike the Immigration Judge, the BIA considered all of Galeas Figueroa's allegations of past harm, including events from before his first removal hearing. Like the Immigration Judge, the BIA concluded that Galeas Figueroa did not demonstrate past persecution or a likelihood of future persecution or torture. In denying statutory withholding of removal, the BIA recognized a likelihood that Galeas Figueroa would be a victim of harmful conduct by private actors. But, using two legal tests interchangeably, the BIA determined that Galeas Figueroa did not establish either that the Honduran government was "unable or unwilling to control" the Mara 18 gang, BIA Op. 2 (AR4), or that the government "condoned the private actions or at least demonstrated a complete helplessness to protect [him]," *id.* (internal quotation marks omitted) (quoting *In re A-B-*, 27 I. & N. Dec. 316, 337 (A.G. 2018)) (AR4). Because Galeas Figueroa did not satisfy either of those tests, the BIA found that the harmful conduct of the Mara 18 gang could not be attributed to the Honduran government. For a similar reason, the BIA concluded that Galeas Figueroa was not entitled to CAT protection: he did not demonstrate that public officials in

Honduras would acquiesce to the gang's violence. Based on those findings, the BIA affirmed the Immigration Judge's decision and entered a final order of removal.

Galeas Figueroa timely petitioned for review of that order, bringing his case within this Court's jurisdiction. *See* 8 U.S.C. § 1252(a)(1).

### C. *The Government's Motion to Dismiss Galeas Figueroa's Petition*

Galeas Figueroa's petition did not automatically stay his removal. Accordingly, to prevent his removal during the pendency of the petition, Galeas Figueroa moved for a stay.[2] That motion was denied.

At that point, without a court-ordered stay, the Government could remove Galeas Figueroa during the pendency of this petition. *See* 8 U.S.C. § 1252(b)(3)(B) ("Service of the petition [for review] on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise."). And while this matter was pending, the Government produced one piece of circumstantial evidence suggesting that Galeas Figueroa received an order to report to custody for removal and that he violated that order. The evidence, a Notice of Immigration Bond Breach (ICE Form I-323), was not addressed to Galeas Figueroa but to his bond obligor. That document indicated that

---

[2] Through an order implementing this Court's standing order of August 8, 2015, upon filing his motion for a stay, Galeas Figueroa received a temporary stay of removal only for the pendency of his motion to stay.

the bond obligor did not deliver Galeas Figueroa to governmental custody, and it notified the bond obligor that the cash bond would be forfeited.

Based on that form, the Government asserted that Galeas Figueroa was a fugitive and moved to dismiss Galeas Figueroa's petition under the fugitive disentitlement doctrine.

## II. DISCUSSION

### A. *The Fugitive Disentitlement Doctrine*

As a threshold matter, if Galeas Figueroa is a fugitive, then this Court may, in its discretion, dismiss his petition under the fugitive disentitlement doctrine. That doctrine originates in the criminal context, and, as explained by the Supreme Court, it protects a court's ability to enforce its judgments by permitting dismissal of a fugitive's appeal:

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe it disentitles the defendant to call upon the resources of the Court for determination of his claims.

*Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam); *see also Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993) ("It has been settled for well over a century

11

that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal."); *Smith v. United States*, 94 U.S. 97, 97 (1876) ("It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render."). This Court has applied the doctrine in the criminal context, *see United States v. Wright*, 902 F.2d 241, 242–43 (3d Cir. 1990); *Virgin Islands v. James*, 621 F.2d 588, 589 (3d Cir. 1980) (per curiam), and in an asset-freeze case, *see In re Assets of Martin*, 1 F.3d 1351, 1356–57 (3d Cir. 1993). It has further recognized that "nothing in the Supreme Court's opinion [in *Molinaro*] suggests that the rule announced there is applicable only in the criminal-law context." *Arana v. INS*, 673 F.2d 75, 77 n.2 (3d Cir. 1982) (per curiam). Accordingly, this Circuit – along with every other circuit to consider the issue[3] – has applied the doctrine in the immigration context. *See id.* at 76–77.

Dismissal under the fugitive disentitlement doctrine remains discretionary, and the Supreme Court has cautioned

---

[3] *See Martin v. Mukasey*, 517 F.3d 1201, 1204–05 (10th Cir. 2008); *Giri v. Keisler*, 507 F.3d 833, 835–36 (5th Cir. 2007) (per curiam); *Garcia-Flores v. Gonzales*, 477 F.3d 439, 441–42 (6th Cir. 2007); *Sapoundjiev v. Ashcroft*, 376 F.3d 727, 728–30 (7th Cir. 2004); *Antonio-Martinez v. INS*, 317 F.3d 1089, 1091–93 (9th Cir. 2003); *Bar-Levy v. U.S. Dep't of Just.*, 990 F.2d 33, 34–35 (2d Cir. 1993); *see also Hassan v. Gonzales*, 484 F.3d 513, 516 (8th Cir. 2007) (recognizing the doctrine, but declining to apply it after an alien voluntarily departed but then failed to meet with government officials to discuss her request for a stay of deportation while no longer in the United States).

against "too free a recourse" to the "sanction of disentitlement." *Degen v. United States*, 517 U.S. 820, 828 (1996); *see also Wright*, 902 F.2d at 243 (stating that dismissal under the fugitive disentitlement doctrine is discretionary). As a limiting principle, this Court has explained that "permitting 'an appellate court to sanction by dismissal any conduct that exhibited disrespect for any aspect of the judicial system, even where such conduct has no connection to the course of the appellate proceedings,' would sweep too broadly." *Marran v. Marran*, 376 F.3d 143, 149 (3d Cir. 2004) (quoting *Ortega-Rodriguez*, 507 U.S. at 246). But the doctrine unquestionably allows dismissal of an appeal when a fugitive has violated a court order to appear. *See, e.g.*, *Arana*, 673 F.2d at 77. Similarly, violation of an immigration agency's order to appear is sufficiently connected to a fugitive's petition for review of a final order of removal to allow for dismissal under the doctrine. *See, e.g.*, *Martin v. Mukasey*, 517 F.3d 1201, 1202–03, 1207 (10th Cir. 2008); *Giri v. Keisler*, 507 F.3d 833, 834–35 (5th Cir. 2007) (per curiam); *Gao v. Gonzales*, 481 F.3d 173, 174 (2d Cir. 2007).

But here, the Government fails to produce sufficient evidence of such a violation. The sole evidence proffered by the Government, the Notice of Immigration Bond Breach (ICE Form I-323), may well have been issued because Galeas Figueroa violated an order to report to custody for removal. But drawing such an inference on the paucity of evidence presented here is not warranted. More probative evidence of Galeas Figueroa's fugitive status – such as an order requiring Galeas Figueroa to report to custody coupled with proof that he did not do so – should be readily available. And without more evidence that Galeas Figueroa is now a fugitive, we

13

decline to impose the "most severe" sanction of dismissal. *Degen*, 517 U.S. at 828.[4]

## B. *Statutory Withholding of Removal Under the Immigration and Nationality Act*

Through his petition, Galeas Figueroa challenges the BIA's denial of his request for statutory withholding of removal under the INA. To be entitled to such withholding, an applicant must prove that it is more likely than not that he or she will be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to a particular country. *See* 8 U.S.C. § 1231(b)(3)(A); *see also INS v. Stevic*, 467 U.S. 407, 429–30 (1984); *Gonzalez-Posada v. Att'y Gen.*, 781 F.3d 677, 684 (3d Cir. 2015). If an applicant makes a showing of future persecution, then he or she cannot be removed to that country but may be removed to another country. *See Doe v. Att'y Gen.*, 956 F.3d 135, 155 (3d Cir. 2020) (noting that "withholding of removal is nondiscretionary"); *Abdulai v. Ashcroft*, 239 F.3d 542, 545 (3d Cir. 2001) ("Withholding of removal . . . confers only the right not to be deported to a particular country—not a right to remain in this one.").

---

[4] Had the Government produced more probative evidence that Galeas Figueroa breached an order to report to custody, then dismissal under the fugitive disentitlement doctrine would have been appropriate. *See Sapoundjev*, 376 F.3d at 729 ("When an alien fails to report for custody, this sets up the situation . . . called 'heads I win, tails you'll never find me.'" (quoting *Antonio-Martinez*, 317 F.3d at 1093)).

14

Here, the BIA agreed with the Immigration Judge's determination that Galeas Figueroa had demonstrated a likelihood of future harm on account of a protected ground (membership in a particular social group, his father's family) upon his return to Honduras.[5] But that alone does not suffice for persecution: the government must also be complicit to some degree in the harm through either act or omission. *See Harutyunyan v. Gonzales*, 421 F.3d 64, 68 (1st Cir. 2005) ("[P]ersecution always implies some connection to government action or inaction."); *Rodas-Mendoza v. INS*, 246 F.3d 1237, 1240 (9th Cir. 2001) ("[V]iolence that the government does not sponsor and in which it is not complicit[] cannot support a reasonable fear of persecution."). And the

---

[5] The BIA reached that conclusion without affording Galeas Figueroa a presumption of future persecution: it determined that he did not establish past persecution and thus did not qualify for that presumption. *See generally* 8 C.F.R. § 1208.16(b)(1) (providing that proof of past persecution raises a rebuttable presumption of future persecution). Galeas Figueroa disputes that finding, arguing that the BIA failed to consider the cumulative suffering he endured and that the limited harm considered by the BIA still suffices for persecution. But persecution is not established by harm alone, and the BIA concluded that the Honduran government was not sufficiently culpable for those prior harmful acts. Because, as explained *infra*, that separate determination regarding the involvement of the Honduran government was not erroneous, any error in assessing the magnitude of past harms was harmless. *See Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011) (applying the harmless error doctrine to a final order of the BIA such that remand is unnecessary "when it is highly probable that the error did not affect the outcome of the case").

BIA determined that the danger Galeas Figueroa feared from the Mara 18 gang did not sufficiently implicate acts or omissions of the Honduran government to constitute persecution.

The BIA arrived at that conclusion by treating as interchangeable two legal standards for determining whether the harmful conduct of private actors may be attributed to the government. The first standard – the unable-or-unwilling-to-control test – evaluates whether the government was "unable or unwilling to control" the individual or group that committed the harm. *Valdiviezo-Galdamez v. Att'y Gen.*, 502 F.3d 285, 288 (3d Cir. 2007) (citation omitted); *see also In re Acosta*, 19 I. & N. Dec. 211, 222 (B.I.A. 1985) ("[H]arm or suffering ha[s] to be inflicted either by the government of a country or by persons or an organization that the government was unable or unwilling to control."). The second standard – the condone-or-complete-helplessness test – examines whether the "the government condoned the private actions or at least demonstrated a complete helplessness to protect the victims." *A-B-*, 27 I. & N. Dec. at 337 (citation and internal quotation marks omitted).

Galeas Figueroa challenges two aspects of the BIA's analysis. First, he contends that the two legal tests are not interchangeable, submitting instead that the condone-or-complete-helplessness test imposes a heightened standard, which the BIA erred by applying. Second, he argues that the unable-or-unwilling-to-control test should govern his case and that, under that test, he would be entitled to statutory withholding. As he sees it, the record lacks substantial evidence that the Honduran government would be able and

willing to control the Mara 18 gang.  As explained below, neither argument succeeds.

> 1. The Legal Equivalence of the Unable-or-Unwilling-to-Control Test and the Condone-or-Complete-Helplessness Test

Galeas Figueroa's challenge to the BIA's denial of statutory withholding rests on his contention that the two legal standards for private-actor persecution are distinct and may not be treated as legal alternatives.[6]  That is an incorrect premise.

---

[6] Related to his contention that the two standards for private-actor persecution are distinct, Galeas Figueroa also argues that through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress incorporated the unable-or-unwilling-to-control standard into the INA.  But that is immaterial because, as explained *infra*, the two standards are legally equivalent.  Moreover, it would be inappropriate to apply the prior construction canon here.  That canon requires a settled meaning of a statutory provision at the time of that provision's reenactment.  *See Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 563 (2017); *see also Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.").  And before IIRIRA's enactment, courts had not uniformly applied the unable-or-willing-to-control formulation as the standard for private-actor persecution.  *See, e.g.*, *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) ("[W]here private discrimination is

neither *condoned* by the state nor the prevailing social norm, it clearly does not amount to 'persecution' within the meaning of the Act." (emphasis added)); *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir. 1994) ("[T]he statute protects against persecution . . . by nongovernmental groups that the government *cannot control*." (emphasis added)); *Adebisi v. INS*, 952 F.2d 910, 914 (5th Cir. 1992) (noting the unable-or-unwilling-to-control test, but also finding that the feared harm "does not arise from activities *instigated or sanctioned* by" the government (emphasis added)); *Rosa v. INS*, 440 F.2d 100, 102 (1st Cir. 1971) (stating that nongovernmental acts may constitute persecution where the group "has sufficient de facto political power to carry out its purposes *without effective hindrance*" (emphasis added)); *Dunat v. Hurney*, 297 F.2d 744, 746 (3d Cir. 1961) (observing that the INA "does not concern itself with the manner in which physical persecution is inflicted, so long as that is the *net effect of the forces or the circumstances that the . . . government will impose*" (emphasis added)). Nor had the BIA. *See, e.g.*, *In re Maccaud*, 14 I. & N. Dec. 429, 434 (B.I.A. 1973) (stating that "persecution must be at the hands of the government, unless the government *cannot control* the persecutors" (emphasis added)); *In re Tan*, 12 I. & N. Dec. 564, 568 (B.I.A. 1967) ("Mob action may be a ground for staying deportation under section 243(h) where it is established that a government *cannot control* the mob." (emphasis added)); *In re Eusaph*, 10 I. & N. Dec. 453, 454–55 (B.I.A. 1964) (stating that private-actor persecution arises when the government is "*unable to take proper measures to control* individual cases of violence" or when the private violence is "the result of a program *sponsored or tolerated*" by the government or the result of acts which the government

Although the tests use different expressions, they are legally equivalent.

Both tests have an overriding commonality: they recognize that to constitute persecution, the government must be complicit to some degree in the harmful conduct of non-governmental actors through either act or omission. The unable-or-unwilling-to-control test does so by requiring that the feared harm be inflicted "by forces that *the government* is unable or unwilling to control." *Orellana v. Att'y Gen.*, 956 F.3d 171, 178 (3d Cir. 2020) (emphasis added); *accord Acosta*, 19 I. & N. Dec. at 222 (explaining that the harm must be inflicted "by persons or an organization that *the government* was unable or unwilling to control" (emphasis added)). Similarly, the condone-or-complete-helplessness test requires a showing "that *the government* condoned the private actions or at least demonstrated a complete helplessness to protect the

---

"*condones*" (emphasis added)); *In re Stojkovic*, 10 I. & N. Dec. 281, 286–87 (B.I.A. 1963) (declining to decide "whether physical harm inflicted upon a person by a mob acting without governmental sanction" constitutes persecution because "there is no evidence that the authorities could not *adequately protect* respondent by *controlling* any outbursts of mob violence" (emphasis added)); *In re Diaz*, 10 I. & N. Dec. 199, 204–05 (B.I.A. 1963) (declining to decide whether "governmental authorities must inflict or *sanction* the physical persecution" (emphasis added)).

victims." *A-B-*, 27 I. & N. Dec. at 337 (emphasis added) (citation and internal quotation marks omitted).

Despite that commonality, the two tests are formulated differently. In the abstract, 'complete helplessness' suggests a greater incapacity than 'unable to control.' Similarly, untethered to context, 'condone' implies a degree of approval not necessarily present in 'unwilling to control.'

But those terms do not operate in isolation; the words surrounding those terms affect their meaning. Notably, the tests measure the degree of the government's relationship to different aspects of private-actor persecution – either to the private actor, the harmful conduct, or the victim. The unable-or-unwilling-to-control test examines whether the government is unable or unwilling to control *the private actor* who inflicts harm. *See Orellana*, 956 F.3d at 178; *Acosta*, 19 I. & N. Dec. at 222. By contrast, the first component of the condone-or-complete-helplessness test assesses whether the government condoned the *harm*. *See A-B-*, 27 I. & N. Dec. at 337. And the second component evaluates whether the government has demonstrated a complete helplessness to protect the potential *victim* of the private harm. *See id.*

A proper comparison of the tests thus requires examining their effect as to the same aspect of private-actor persecution. And that can be done by examining how each test applies to the potential victim of private harm – the applicant seeking relief from removal.

From that perspective, the unable-or-unwilling-to-control test is a shorthand of sorts. It depends on more than merely the government's inability or unwillingness to control a violent

20

group in the abstract. Rather, that inability or unwillingness to control a violent group becomes relevant only in the context of a specific individual, the applicant. And a government's inability or unwillingness to control a violent group as a general matter does not necessarily mean that the government cannot or will not protect the specific applicant. *See Valdiviezo-Galdamez*, 502 F.3d at 289 (linking the unable-or-unwilling-to-control test to the government's protection of the victim); *see also In re McMullen*, 17 I. & N. Dec. 542, 544–45 (B.I.A. 1980) (same). Accordingly, the unable-or-unwilling-to-control test evaluates the government's ability and willingness to control private actors not at a general level, but rather with respect to the specific applicant seeking relief.

The condone-or-complete-helplessness test similarly focuses on the applicant, only more explicitly. The 'complete helplessness' component assesses the government's ability to protect a particular applicant from private harmful conduct. And the 'condone' component examines whether the government condoned private harm to that applicant.

Recognizing those differences, the corresponding parts of each test may be compared. The apparent capacity differential between 'unable to control' and 'complete helplessness' relates to different objects. The 'unable to control' prong describes the government's power relative to private actors who intend to harm the applicant for asylum or withholding. The 'complete helplessness' prong describes a different relationship, the government's power in relation to the potential victim. Calibrating for context, however, harmonizes the two standards: when the government is unable to control private actors with respect to a specific potential victim, it

21

demonstrates a complete helplessness to protect that victim from those actors.

Surrounding words also aid comparison of the other analogous components of the two tests. The 'unwilling to control' prong describes the relationship between the government and a private actor as it affects the safety of the applicant for asylum or withholding. By contrast, the 'condone' prong describes the government's relationship not to private actors, but to the harm those private actors inflict. Thus, those two standards – 'unwilling to control' and 'condone' – derive their meaning from separate objects. Accounting for that, the two standards converge – at least when a government is unwilling but able to control a violent group for purposes of protecting the applicant. In that case, when the government can protect the individual but does not, it condones the group's harmful acts through its unwillingness to control the group.

Nonetheless, the parity between the 'condone' and 'unwilling to control' prongs has a limit. While the two formulations cover the same ground when the government is unwilling *but able* to control a violent group, that congruence ceases when the government is unwilling *and unable* to control a violent group. In that latter circumstance, the government cannot be said to condone harm inflicted by a violent group that the government is unable to control. Therefore, the 'condone' prong is not coterminous with the 'unwilling to control' prong in all instances.

But that gap is not fatal to the legal equivalence of the two tests. As explained above, when a government is unable to control a violent group with respect to a particular person, that

government is completely helpless to protect that person from that group. Thus, through the combined operation of the 'condone' and 'complete helplessness' prongs, the condone-or-complete-helplessness test becomes legally equivalent to the unable-or-unwilling-to-control test. By either condoning private harm or being completely helpless to protect a potential victim from such harm, a government is sufficiently culpable to have committed persecution.

A broader perspective confirms that conclusion. The unable-or-unwilling-to-control standard governs four discrete factual scenarios of governmental responsiveness to private-actor harm:

- Scenario 1 – able and willing to control the violent group;

- Scenario 2 – unable but willing to control the violent group;

- Scenario 3 – able but unwilling to control the violent group; and

- Scenario 4 – unable and unwilling to control the violent group.

Under the unable-or-unwilling-to-control test, a government is complicit in private-actor persecution in all but Scenario 1 – that is in Scenarios 2, 3, and 4. The condone-or-complete-helplessness standard yields the same result. By operation of the 'complete helplessness' prong, the government is culpable for private harm in Scenarios 2 and 4 because in both instances the government is unable to protect the victim from the private actors. And the 'condone' prong renders the government complicit in private harm in Scenario 3. In that circumstance,

by having the ability but not the willingness to prevent the harm, the government condones the harm to the victim. Accordingly, both tests generate the same results in each of the four factual scenarios.

For these reasons, the unable-or-unwilling-to-control test and the condone-or-complete-helplessness test are legally equivalent alternatives. Distilled to their essence, both tests stand for the same fundamental proposition: if a government is willing and able to afford some protection to an individual against harms inflicted by private actors, then that government is not sufficiently complicit in the private conduct for those acts to constitute persecution for purposes of relief from removal.

Of the other circuits to consider this issue, all but one have reached a similar conclusion. Several circuits use the condone-or-complete-helplessness test as an alternative for the unable-or-unwilling-to-control test. *See, e.g.*, *Guillen-Hernandez v. Holder*, 592 F.3d 883, 886–87 (8th Cir. 2010); *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006); *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Kere v. Gonzales*, 252 F. App'x 708, 712 (6th Cir. 2007). And some have expressly held that the two standards are the same. *See Scarlett v. Barr*, 957 F.3d 316, 331–34 (2d Cir. 2020); *Gonzales-Veliz v. Barr*, 938 F.3d 219, 233–34 (5th Cir. 2019); *see also Rosales Justo v. Sessions*, 895 F.3d 154, 166 n.9 (1st Cir. 2018) (describing *A-B-*'s description of the government-nexus requirement as "consistent with our precedent"). This conclusion also comports with the most recent interpretation by the former Acting Attorney General in an administratively precedential decision. That opinion, *In re A-B- II*, explained that "[t]he 'complete helplessness' language does not depart

from the 'unable or unwilling' standard; the two are interchangeable formulations." 28 I. & N. Dec. 199, 200–02 (A.G. 2021).

The sole outlier is the D.C. Circuit. It has rejected the legal equivalence of the tests, holding instead that the condone-or-complete-helplessness test imposes a heightened standard for private-actor persecution claims. *See Grace v. Barr*, 965 F.3d 883, 897–900 (D.C. Cir. 2020). But that decision does not account for the combined effect of the two prongs of the condone-or-complete-helplessness test; instead, it isolates the standards from their surrounding words and overlooks the relationships they describe. *See id.* at 898–99. We are neither persuaded nor bound by that analysis.[7] Instead, we align with the majority of circuits to have considered this issue by holding that the unable-or-unwilling-to-control test and the condone-or-complete-helplessness test are legally equivalent for purposes of evaluating private-actor persecution.

---

[7] Although a partial affirmance of a nationwide injunction, the D.C. Circuit's ruling in *Grace* does not govern this case. Galeas Figueroa was not a party to that litigation, and his petition does not relate to the enjoined conduct: the Government's process for making credible fear determinations. *See Grace v. Whitaker*, 344 F. Supp. 3d 96, 105 (D.D.C. 2018) (permanently enjoining the government from continuing to apply credible fear policies). And even if Galeas Figueroa were within the scope of the limited injunction, it is uncertain whether the injunction of the *A-B-* decision has any lingering potency after *A-B- II*.

2. Substantial Evidence Supports the BIA's Determination of No Private-Actor Persecution

Applying both the unable-or-unwilling-to-control test and the condone-or-complete-helplessness test, the BIA denied Galeas Figueroa's application for statutory withholding. Specifically, the BIA found that Galeas Figueroa had failed to establish that the Honduran government "condoned the acts of violence or is completely helpless to protect victims of crime," or is "unable or unwilling to control the feared gangs." BIA Op. 2–3 (AR4–5). Those factual findings are subject to substantial-evidence review and may not be set aside "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Doe*, 956 F.3d at 140; *Mendoza-Ordonez v. Att'y Gen.*, 869 F.3d 164, 170 n.15 (3d Cir. 2017).

Galeas Figueroa contends that two pieces of record evidence compel the conclusion that the Honduran government cannot or will not control the Mara 18 gang. First, he cites the non-investigation and non-prosecution of the gang for its repeated violence toward his family, despite the filing of multiple police reports. Second, he relies on the State Department's country conditions report for Honduras, which identifies the Mara 18 gang as among the criminal elements that "committed murders, extortion, kidnappings, human trafficking, and acts of intimidation against police, prosecutors, journalists, women, and human rights defenders." U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Country Report on Human Rights Practices for 2016: Honduras 4 (2016) (AR499).

26

The BIA considered Galeas Figueroa's evidence. It acknowledged that "multiple police reports were filed, without satisfactory results, when [Galeas Figueroa's] family members were killed or harmed or he was threatened." BIA Op. 2 (AR4). The BIA also recognized that, according to the country conditions report, "many murders in Honduras go unsolved," and the government "has been unable to completely eradicate gangs." *Id.*

But the BIA ultimately determined that "the Honduran government has taken significant steps to combat gang violence and public corruption" – reflecting neither an inability nor an unwillingness to protect Galeas Figueroa from the gang. *Id.* at 2–3 (AR4–5). In addition, the BIA concluded that the lack of success in prosecuting the gang members for their past violent acts could be due to the vagueness and deficiencies in the police reports that Galeas Figueroa and his family filed – not the government's condonation of the gang's harmful acts or its complete helplessness to protect him. Indeed, one report was filed years after the incident, and most of the others did not even describe the assailants, let alone identify them as gang members. The BIA thus found that the record evidence, considered as a whole, was insufficient to justify relief.

Because a reasonable adjudicator would not be compelled to reject that conclusion, substantial evidence supports the BIA's denial of Galeas Figueroa's application for statutory withholding of removal. *See* 8 U.S.C. § 1252(b)(4)(B); *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 106 (3d Cir. 2010) (recognizing that substantial-evidence review is "highly deferential" to the agency).

27

*C. Protection Under the Convention Against
Torture*

Galeas Figueroa next challenges the BIA's denial of his
request for withholding of removal under the Convention
Against Torture.  To qualify for mandatory CAT withholding,
an alien must demonstrate that "it is more likely than not that
he or she would be tortured if removed to the proposed country
of removal."  8 C.F.R. § 1208.16(c)(2) (2020).  As defined by
the CAT implementing regulations, torture is "an extreme form
of cruel and inhuman treatment."  *Id.* § 1208.18(a)(2); *see
Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005) (listing the
elements of torture).  One of the elements of torture requires
that the severe pain or suffering be inflicted "by or at the
instigation of or with the consent or acquiescence of a public
official or other person acting in an official capacity."  8 C.F.R.
§ 1208.18(a)(1) (2020); *see also Auguste*, 395 F.3d at 151.

The BIA determined that Galeas Figueroa failed to prove
that element, and on that basis, it denied CAT relief.  Galeas
Figueroa disputes that ruling and contends that through willful
blindness, the Honduran government would acquiesce to his
likely torture by the Mara 18 gang.  *See Silva-Rengifo v. Att'y
Gen.*, 473 F.3d 58, 65 (3d Cir. 2007) ("[A]n alien can satisfy
the burden established for CAT relief by producing sufficient
evidence that the government in question is willfully blind to
such activities.").

In this Circuit, the analysis of governmental acquiescence
to torture involves a two-part inquiry.  *See Myrie v. Att'y Gen.*,
855 F.3d 509, 516 (3d Cir. 2017).  The first question is one of
fact: How will public officials likely act in response to the harm
that the alien fears?  The second step involves a legal question:

Will the public officials' likely response amount to acquiescence?

Regarding the first inquiry – the government's likely response to the feared harm – the BIA concluded that public officials in Honduras would likely investigate the threats against Galeas Figueroa. Under the "highly deferential" substantial-evidence standard of review that applies to the agency's factual findings, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), that determination is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B).

Galeas Figueroa disputes the BIA's conclusion. He relies on the government's failure to prosecute the gang members for their violent acts against him and his family. And he also cites the country conditions report's identification of the Mara 18 gang as a dangerous criminal group in Honduras.

Consistent with its obligation to consider "all evidence relevant to the possibility of future torture," 8 C.F.R. § 1208.16(c)(3) (2020), the BIA weighed Galeas Figueroa's evidence. It acknowledged that "the Honduran government was unable to bring the gang members who harmed [Galeas Figueroa's] family to justice." BIA Op. 3 (AR5); *see also id.* at 2 (AR4) (recognizing that "many murders in Honduras go unsolved"). But even accounting for that evidence, the BIA determined that "the Honduran government is actively taking measures to combat gang violence," such that the Honduran police would likely take a report and open an investigation. *Id.* at 3 (AR5); *see also id.* at 2 (AR4) (confirming that "the Honduran government has taken significant steps to combat gang violence and public corruption"). While every predictive

judgment is subject to second-guessing, especially when it involves the behavior of foreign governmental actors, the BIA's conclusion is not one that a reasonable adjudicator would be compelled to reject. *See* 8 U.S.C. § 1252(b)(4)(B). Therefore, the BIA's factual assessment of the Honduran government's likely response to the pain or suffering that Galeas Figueroa may experience in Honduras survives substantial-evidence review.

As a legal question, the second acquiescence inquiry – whether the government's likely response constitutes acquiescence – receives *de novo* review. *See Myrie*, 855 F.3d at 515–16. On this issue, Galeas Figueroa argues that the Honduran government would acquiesce through willful blindness to his future harm in Honduras. But a government that investigates reports of private violence is not willfully blind to that violence. *See Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 610–12 (3d Cir. 2011) (upholding the BIA's determination that the Honduran government was not willfully blind to gang violence where the police were investigating five police reports, even though the victim "never saw any progress" (citation omitted)). Nor does the ineffectiveness of the Honduran police in solving the Galeas Figueroa family's prior reports of crime mean that investigations of future reports of crime would be so unsuccessful as to constitute acquiescence. The delay by the Galeas Figueroa family in reporting a crime along with the incomplete leads they provided made the investigations more difficult. And as the BIA recognized, the Honduran government has since improved its anti-crime efforts. Thus, as a matter of law, the Honduran government's likely response to future reports of crime – taking a report and commencing an investigation – does not constitute acquiescence.

Accordingly, neither prong of the acquiescence inquiry provides a basis to grant Galeas Figueroa's petition for CAT withholding. Substantial evidence supports the BIA's conclusion that the Honduran government would likely investigate reports that Galeas Figueroa would make to the police. And on this record, that response does not constitute acquiescence.

* * *

For the foregoing reasons, we will deny both the Government's motion to dismiss and Galeas Figueroa's petition seeking statutory withholding of removal and CAT protection.