NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0146n.06

No. 23-4025

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARVIN CACERES-SANCHEZ, | ) | |
| Petitioner, | ) ) ) | ON PETITION FOR REVIEW |
| v. | ) ) | FROM THE BOARD OF IMMIGRATION APPEALS |
| PAMELA BONDI, Attorney General, | ) ) | OPINION |
| Respondent. | ) ) ) | |

FILED
Mar 17, 2025
KELLY L. STEPHENS, Clerk

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

CLAY, J., delivered the opinion of the court in which WHITE, J., concurred, and NALBANDIAN, J., concurred in Parts II.B.2 and II.B.3. WHITE, J., (pg. 23), delivered a separate concurrence. NALBANDIAN, J. (pp. 24–40), delivered a separate opinion concurring in part and dissenting in part, in which WHITE, J., concurred in Part III.

**CLAY, Circuit Judge.** Petitioner Marvin Caceres-Sanchez, a citizen of Honduras, filed an application for withholding of removal under both the Immigration and Nationality Act ("INA"), 8 C.F.R. § 208.16, and the Convention Against Torture ("CAT"), 8 C.F.R. § 1208.16. The immigration court denied his application and the Board of Immigration Appeals ("BIA") affirmed. Petitioner now petitions for review of the BIA's determination. For the reasons set forth below, we **GRANT** the petition in part, **DENY** the petition in part, and **REMAND** to the BIA for further proceedings.

## I.     BACKGROUND

### A.  Factual History

Petitioner is a citizen of Honduras.  After serving in the Honduran military for several years, Petitioner worked in his family's businesses where he was often approached by gang members and encouraged to join criminal enterprises.  After several incidents with local gangs, including an attempted shooting, Petitioner fled his home country in 2005 and unlawfully entered the United States.  Petitioner subsequently resided in the United States for thirteen years but was removed by court order in October 2018.  He then returned home to Honduras, where he began to work at a restaurant owned by his mother.  Among the employees at the restaurant was Petitioner's niece, Cynthia, who was raised with Petitioner and whom Petitioner considered a sister.  At the time Petitioner started working at the restaurant, Cynthia was dating a man who was a member of the MS-13 gang.

Starting in April 2019, Petitioner began to notice that there were large discrepancies in the financial accounting of the restaurant, such that the restaurant's bank statements did not match expense receipts.  Petitioner asked Cynthia about the discrepancies, to which she responded that Petitioner "should stop digging and that she considered [Petitioner] her enemy."  Admin. R., ECF No. 6-2, 395.  This did not stop Petitioner's investigating, however, as his financial reviews continued throughout the summer of 2019.  Those reviews uncovered that Cynthia, her boyfriend, and MS-13 members had used the restaurant as a money laundering vehicle.  Upon learning of Petitioner's discovery, Cynthia and MS-13 initially attempted to bribe Petitioner into cooperation.

After Petitioner denied their bribes, Cynthia and MS-13 changed course and began a campaign of death threats and intimidation.

Cynthia moved to the United States in October 2019, from where she continued to harass and threaten Petitioner. She frequently sent emails stating that she was planning to kill Petitioner and his wife, and even told Petitioner that she took out a loan to pay MS-13 members to murder him. Then, starting in December 2019, MS-13 gang members began to stalk and surveil Petitioner and his wife. MS-13 also appears to have orchestrated a car crash in January 2020, in which a car hit Petitioner and his wife while the couple were driving through a mountainous area. After the car crash, Petitioner sought to enlist the help of local police, but after several follow-ups, Petitioner was told by the police that "there was no point in trying to report the incident." *Id*. at 396.

Shortly after the car crash, the COVID-19 pandemic froze much of public life in Honduras, and Petitioner heard little from MS-13. Yet the harassment from Cynthia via email did not abate. Petitioner again attempted to enlist the help of police in November 2020, in which he reported both the threats and the money laundering scheme. Several days after this outreach, Petitioner and his wife were going to a grocery store when they were stopped by MS-13 members. The members ordered the couple into a van, drove to a non-descript location, and tied up and beat the couple. Gang members told Petitioner and his wife that "it was stupid of [them] to go to the police because the police couldn't do anything to protect [them]," and that MS-13 "had people inside the police who told them everything and they would always find out if [Petitioner or his wife] reported them." *Id*. at 397. The kidnapping climaxed as the members shot Petitioner in the elbow, raped Petitioner's wife while forcing Petitioner to watch, demanded financial information, and drained the couple's bank account.

Petitioner and his wife tried to flee after this incident. They first sought refuge at a friend's house, only for MS-13 members to show up at the house shortly thereafter. The couple then fled to the United States by way of Mexico. While staying in Mexico City, however, the couple was followed by an ominous driver who was only thwarted once the couple managed to reach the police in a nearby bus station. Petitioner's wife ultimately entered the United States with her daughter in January 2021, and Petitioner entered two months later in March. Since Petitioner has left Honduras, his son (who still resides in Honduras) has received death threats from MS-13 and was informed by members that the gang is "determine[d] to punish" Petitioner by killing him and his wife. *Id*. at 398.

### B. Procedural History

On October 3, 2022, Petitioner was served with a Notice of Intent/Decision to Reinstate Prior Order, and on October 25, 2022, an asylum officer found that Petitioner had not established a reasonable fear of persecution or torture if he returned to Honduras. Shortly after this decision, on November 28, 2022, U.S. Immigration and Customs Enforcement ("ICE") inadvertently posted sensitive information related to Petitioner on ICE's website, which revealed that Petitioner sought protection in the United States. ICE later disclosed this inadvertent release to the immigration court in January 2023.

After receiving the asylum officer's decision, Petitioner sought relief from removal before the immigration court, and the court heard Petitioner's case in February 2023. The immigration court denied Petitioner's application, but the BIA remanded the case after finding that the court had improperly applied Fourth Circuit, instead of Sixth Circuit, case law. The immigration court later issued its decision on remand on June 22, 2023.

In its June 2023 decision, the immigration court examined Petitioner's requested relief under both the INA and CAT. Under the INA, the court noted that Petitioner specifically applied for withholding of removal "on account of his religion, his political opinion, and his membership in proposed particular social groups" pursuant to 8 C.F.R. § 208.16(b)(3). Admin. R., ECF No. 6-2, 39. As for "membership in proposed particular social groups," Petitioner identified two groups: (1) "actual and/or perceived immediate family members of Cynthia Nicolle Caceres Sanchez," and (2) "Hondurans whose personal identifying information was inadvertently disclosed by [ICE] on it[s] public-facing website on or about November 28, 2022." *Id.* With respect to "political opinion," Petitioner argued that he was "persecuted on account of an imputed anti-gang political opinion." *Id.* The court noted that Petitioner did not argue that he faced religious persecution.

The court began its INA analysis by finding that Petitioner's testimony was credible. It then analyzed Petitioner's argument that he is a member of the particular social group ("PSG") of immediate family members of Cynthia Nicolle Caceres Sanchez. The court found that while membership in that group constituted a PSG, Petitioner had not shown that his membership in the PSG was a reason for the past and feared future harm. Specifically, the court determined that it was Petitioner's interference with Cynthia's and MS-13's criminal enterprise, rather than his family membership, that caused the harm. The court next reviewed Petitioner's political opinion argument relating to persecution on account of anti-gang political views and found that this position was also unsupported by the record. According to the court, Petitioner provided no testimony suggesting that he shared his anti-gang views with MS-13 members, spoke out generally regarding gangs, or that Cynthia "imputed a political opinion to him." *Id.* at 40–41. Finally, the court noted that there was not a clear probability that Petitioner would be threatened in Honduras

due to his political opinions, especially considering that Cynthia has resided in the United States for several years.

The court then turned to the issue of government persecution, finding that Petitioner had not shown that the Honduran government harmed him or that the government was "unwilling or unable to control Cynthia and the gang members." *Id.* at 41. To support this finding, the court first commented on Petitioner's attempt to reach the police after the car crash incident in January 2020. The court did not find this demonstrative of an "unwilling or unable" finding, as Petitioner did not tell the police that he knew who hit his car, provided no evidence that he returned to the police station after initially reporting the hit, and did not indicate that he sought to seek further police protection after the incident. The analysis then focused on Cynthia's threatening emails, noting that Petitioner had only told the police of Cynthia's threats in late 2020—nearly fifteen months after the threats began. By that point, Cynthia had moved to the United States, which heavily limited the Honduran government's capacity to respond. The court also highlighted that Petitioner had never informed the police of the most horrific element of MS-13's harassment: the November 2020 kidnapping, shooting, and sexual assault incident. The court concluded by noting that country conditions did not indicate that the Honduran government is generally unable or unwilling to assist victims of gang violence, as thousands of individuals in Honduras are currently incarcerated on gang-related charges.

The immigration court next found that Petitioner's proposed PSG of Hondurans whose information was released by ICE was not cognizable. There was little evidence, according to the court, that "Honduran society perceives or recognizes this claimed group as being socially

distinct." *Id*. at 44. The court also held that there was no reason to find that the inadvertent disclosure of information would cause Petitioner to face future persecution.

Each of these factors led the immigration court to conclude that Petitioner had "not demonstrated that there is a clear probability that his life or freedom would be threatened in Honduras on account of a protected ground." *Id.* at 45. Accordingly, the court denied Petitioner's application for withholding of removal under the INA.

After concluding its INA analysis, the immigration court turned to Petitioner's argument for relief under CAT, 8 C.F.R. § 1208.16. The court found that Petitioner was not entitled to relief because (1) he had not established that the Honduran government tortures individuals like him, and (2) there was "insufficient objective evidence in the record that, if he were harmed by an individual or nongovernmental entity, that [*sic*] the government of Honduras would consent or acquiesce to his torture." *Id.* at 46. In coming to this conclusion, the court largely repeated its findings from its INA analysis.

Petitioner appealed the immigration court's decision to the BIA. The Board reviewed Petitioner's appeal, and on November 30, 2023, affirmed the immigration court's INA and CAT determinations "for the reasons stated in [the court's] decision." *Id.* at 5, 7. Petitioner also argued to the BIA that the immigration court had violated his due process rights. While the immigration court held hearings before it released its initial decision, it did not hold hearings or permit additional briefing when it released its June 2023 decision on remand. This, according to Petitioner, constituted a due process violation—an argument which the BIA rejected.

## II.   DISCUSSION

### A.  Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision," as is the situation in this case, "we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citation omitted). "However, to the extent the BIA adopted the immigration judge's reasoning," as is also the situation in this case, "this court also reviews the immigration judge's decision."[1] *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (citation omitted). The Court reviews legal questions de novo. *See id*. "The agency's findings of fact are reviewed for substantial evidence," *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016) (citation omitted), meaning that those findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) (citation omitted). The Court also reviews alleged due process violations in immigration proceedings de novo. *See Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

### B.  Analysis

#### 1.  Withholding of Removal Under the INA

Petitioner seeks relief under INA § 241(b)(3), which mandates withholding of removal if an alien shows that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An applicant for withholding of removal "must demonstrate that there is a clear probability that he will be subject to persecution if forced to return to the

---

[1] The BIA adopted the immigration court's reasoning with respect to withholding of removal under the INA and CAT. We therefore focus our analysis on the findings of the immigration court with respect to these issues.

country of removal." *Khalili*, 557 F.3d at 436 (citation and quotation marks omitted). Persecution is defined as "the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim." *Id*. (citation omitted). If an applicant establishes past persecution in the proposed country of removal on account of a protected ground, the applicant is entitled to a presumption that his life or freedom would be threatened in the future based on the original claim. 8 C.F.R. § 1208.16(b)(l)(i).

A withholding-of-removal applicant alleging private-actor persecution must also "independently prove that (1) the violence arises or would arise on account of h[is] membership in a PSG" (otherwise known as the "nexus" requirement), "and (2) the government is unable or unwilling to control the private violence." *Tista-Ruiz de Ajualip v. Garland*, 114 F.4th 487, 495 (6th Cir. 2024) (cleaned up). Where, as here, the agency found an alien's testimony to be credible, this Court "must accept the representations petitioner[] made in the application and [his] testimony as true." *Gilaj v. Gonzales*, 408 F.3d 275, 285–86 (6th Cir. 2005).

The immigration court found that Petitioner experienced past harm that rose to the level of persecution. But the court also determined that Petitioner failed to establish the nexus requirement and that the Honduran government is unable or unwilling to control Petitioner's persecutors. Because the immigration court and the BIA did not conduct a mixed-motives analysis and appear not to have considered all evidence relevant to Petitioner's claim, we remand.

### a. *The Nexus Requirement*

To meet the nexus requirement (i.e., to show that there is a connection between the harm feared and the PSG), this Court has found that a withholding-of-removal petitioner need only show that a protected ground was "at least one reason for [his] persecution." *Guzman-Vazquez v. Barr*, 959 F.3d 253, 274 (6th Cir. 2020). This standard is distinctively "weaker than" the standard

required to grant asylum, for which a petitioner must show that his protected ground is a "central reason" for his persecution. *Id*. at 272. Certain situations may constitute mixed-motive cases, in which "a petitioner's alleged persecutors are motivated both by a protected ground and other, nonprotected grounds, such as personal pecuniary gain." *Skripkov v. Barr*, 966 F.3d 480, 487 (6th Cir. 2020). In mixed-motives cases, "the petitioner is eligible for asylum or the withholding of removal so long as *one* of the factors motivating the persecution is a protected ground under the INA." *Stserba v. Holder*, 646 F.3d 964, 972–73 (6th Cir. 2011) (cleaned up).

In conducting its analysis, the immigration court found that Petitioner had in fact established a cognizable PSG: membership of Cynthia's immediate family. Yet the court also found insufficient evidence to establish a nexus between this PSG and the harm suffered by Petitioner. It noted that Petitioner had a good relationship with Cynthia prior to his taking over of the restaurant's management and that the real reason for Cynthia's hostility was Petitioner's interference with criminal enterprises. According to the immigration court, this demonstrated that there was no connection between membership of Cynthia's family and the harms suffered by Petitioner.

The court's analysis is faulty because it does not account for mixed motives. The immigration court is correct that the record establishes that a contributing reason for Cynthia's and MS-13's attacks on Petitioner was his interference with criminal activities. Yet the court neglected to consider whether the threats and violence experienced by Petitioner are "inextricably intertwined with [his] particular social group[]" because control of Petitioner's family business is tied to membership in Cynthia's immediate family. *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 850 (6th Cir. 2023) (quotation marks omitted). In *Mazariegos-Rodas v. Garland*, this court required the BIA to reconsider the nexus between persecution and a family-based PSG where gang

members attempted to recruit one of the petitioners to sell drugs. 122 F.4th 655, 660 (6th Cir. 2024). After she declined, the gang members interpreted this refusal to be the result of the petitioner having parents in the United States who could financially support her. *Id.* at 673. Because that petitioner was financially secure and therefore did not need to sell drugs, the gang members changed tactics and threatened to harm her and her sister. *Id.* This Court rejected the BIA's conclusion that "the gang members were motivated by financial gain rather than an animus toward [the petitioners'] family." *Id.* at 673 (quoting the BIA). The Court noted that the gang members' comments, which included remarks about the petitioners' parents' money, indicated that they "believed that they had been unable to recruit [the petitioner] (and thus increase their drug-selling revenue) 'precisely because of' [the petitioner's] familial relationship with her parents." *Id.* at 674 (quoting *Skripkov v. Barr*, 966 F.3d 480, 486–87 (6th Cir. 2020)).

The *Mazariegos-Rodas* Court favorably cited a Fourth Circuit case in support of its analysis. *See id.* In *Perez Vasquez v. Garland*, the Fourth Circuit addressed the nexus requirement for a petitioner who faced extortion from gang members because they knew that the petitioner traveled to a nearby town to withdraw money that her husband sent from the United States. 4 F.4th 213, 218 (4th Cir. 2021). The Fourth Circuit found that the BIA and immigration court erred because they focused on "why the gang targeted Petitioner's family, rather than on why they targeted Petitioner herself." *Id.* at 222 ("In cases involving family-based particular social groups, identifying why the petitioner's *family* was targeted is not the relevant question for nexus. Rather, the operative question is whether the petitioner's membership in their family is a central reason why *they, and not some other person*, were targeted." (cleaned up)). The *Perez Vasquez* court found that the BIA and immigration court "erred by focusing narrowly on the immediate trigger for the gang's extortion demands and death threats—*i.e.*, their greed or desire for monetary gain."

*Id.* at 224 (cleaned up). In doing so, the BIA and immigration court failed to "properly consider[] other intertwined reasons for Petitioner's persecution"—namely, "Petitioner's familial relationship to her husband." *Id.*[2]

In *Mazariegos-Rodas* and *Perez Vasquez*, the petitioners' family ties were key to whether the persecutors could extract money from the petitioners. Here, too, Petitioner's family ties led him to control the family restaurant and, in turn, are key to Cynthia and MS-13's ability to launder money through that restaurant. Cynthia and the gang had to target "immediate family members of Cynthia," and not members of any other family, precisely because it was certain of those "immediate family members" who controlled the family restaurant. *Perez Vasquez* advises us not to ask why the *family* was persecuted, but rather why an individual related thereto was persecuted.

The record here supports requiring the BIA and immigration court to conduct an adequate mixed-motives analysis. The operations of the restaurant were a family affair: the restaurant was owned by Petitioner's mother, was financed and managed by Petitioner, and employed family members such as Cynthia and Petitioner's son (until the events at issue in this case made it untenable for him to continue). Absent these family ties, Petitioner and Cynthia would have likely not worked at this restaurant, and Cynthia would have had no reason to target Petitioner. There would have been no need for MS-13 members to visit the restaurant "looking at who comes and goes and to keep tabs in [*sic*] [Petitioner's] family," as Petitioner's son stated in an affidavit. Admin. R., ECF No. 6-2, 409.

Indeed, Cynthia herself appears to have believed that to regain control of the family-run restaurant, she needed to eliminate certain immediate relatives—i.e., Petitioner, his wife, and their

---

[2] Notably, the Fourth Circuit reached this conclusion in the context of the "central reason" standard, which in the Sixth Circuit is a higher standard than that applicable to withholding-of-removal claims. *Mazariegos-Rodas*, too, remanded in the context of an asylum claim.

children. In particular, Cynthia emailed Petitioner's wife and threatened that the wife and her "beloved daughter . . . will pay for you wanting take ownership of everything I worked so hard for." *Id.* at 473. In another email, Cynthia wrote, "Everything is mine and it will always be like this you will not keep anything; *one by one* you will die until everything is mine." *Id.* at 475 (emphasis added). MS-13 also issued death threats to Petitioner's son. These threats suggest that the ability to launder money through the restaurant cannot be untangled from persecuting the *family* that ran it. *Compare Gonzalez Ruano v. Barr*, 922 F.3d 346, 356 (7th Cir. 2019) (where the petitioner was persecuted because a gang member was romantically interested in the petitioner's wife, the nexus to a family-based PSG was established by the fact that the persecutors' "stated purpose" was "destroying [the wife's] family"), *with Sandoval v. Garland*, 852 F. App'x 1026, 1027 (6th Cir. 2021) (holding that persecution by a woman in love with the petitioner's husband was the result of romantic jealousy because, in part, the petitioner's children were never harmed, and "[t]he targeted nature of the threats [to just the petitioner] is further evidence that [the persecutor] was not motivated by a desire to harm [other] members of [the petitioner's husband's] family").[3]

---

[3] Although the immigration court recited some of these critical facts in the "Testimonial Evidence" section of its decision, it appears not to have engaged in any meaningful analysis of them. *See* Admin R., ECF No. 6-2, 31–35, 39–40. Instead, it categorically waived them away as mere "subjective beliefs" before summarily concluding that Petitioner "provided insufficient testimony or evidence [that] his family relationship motivated Cynthia to seek his harm." *Id.* at 40. Further, the weight of Cynthia's amicable relations with certain other family members, one of the few facts that the immigration court *did* expressly consider, is undercut by our case law. *See Gonzalez Ruano*, 922 F.3d at 356–57 ("Threats to harm other members of the group can certainly be relevant, but they are not essential to such an asylum claim."); *R.R.D. v. Holder*, 746 F.3d 807, 809 (7th Cir. 2014) (asylum statute "does not require that all members of that category suffer the same fate"). We have explained, albeit in the context of abuse-of-discretion review, that "[t]hough [the immigration court] need not 'write an exegesis on every contention,' [it] must 'consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'" *Trujillo Diaz v. Sessions*, 880 F.3d 244, 255 (6th Cir. 2018) (quoting *Scorteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003)). Here, the

The BIA and the immigration court's failure to examine the possibility of mixed motives was thus an important failure, as a mixed-motives analysis strongly suggests that Petitioner's PSG was at least partially responsible for the threats and harm he experienced.[4] Accordingly, because the BIA and immigration court's "determination [was] based on flawed reasoning," their determination does "not satisfy the substantial evidence standard." *Diaz-Zanatta v. Holder*, 558 F.3d 450, 454 (6th Cir. 2009) (citation omitted); *Mazariegos-Rodas*, 122 F.4th at 664.[5]

### b. *The Honduran Government's Willingness or Ability to Control*

To determine whether a government is unwilling or unable to control private actors, courts look to "both specific evidence about the government's response to the crimes inflicted on an

---

immigration court's decision "does not indicate that [the immigration court or] the BIA considered 'all evidence relevant to'" Petitioner's claim. *Mandebvu v. Holder*, 755 F.3d 417, 433 (6th Cir. 2014) (quoting *Mostafa v. Ashcroft*, 395 F.3d 622, 626 (6th Cir. 2005)). This flaw represents a basis for remand independent of the immigration court's failure to consider mixed motives.

[4] One other consideration supports our conclusion that the immigration court failed to conduct a mixed-motives analysis: its claim that because Cynthia and MS-13 would have treated Petitioner the same even had he not been an immediate member of Cynthia's family, that protected characteristic could not have been "a reason" for the persecution. It is not clear that the application of "but-for" causation is consistent with mixed-motives analysis. *See, e.g.*, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 383–84 (2013) (Ginsburg, J., dissenting) ("When more than one factor contributes to a plaintiff's injury, but-for causation is problematic. When an event is 'overdetermined,' *i.e.*, when two forces create an injury each alone would be sufficient to cause, modern tort law permits the plaintiff to prevail upon showing that either sufficient condition created the harm. . . . [Further, e]ven if the test is appropriate in some tort contexts, it is an entirely different matter to determine a 'but-for' relation when considering, not physical forces, but the mind-related characteristics that constitute motive." (cleaned up)). This is especially true in the withholding-of-removal context, where the protected characteristic need only be "a reason"—not "one central reason"—for the persecution. *See Guzman-Vazquez*, 959 F.3d at 272 (rejecting the dissent's position that a withholding-of-removal claim should require but-for causation); *see also Coello-Valle v. Garland*, 2023 WL 5975159, at *1 (9th Cir. Sept. 14, 2023) (holding that as applicable to asylum claims, "[a] central reason is a but-for cause," but "[t]he nexus standard for withholding is a lower bar; the applicant must only show that their PSG was 'a reason' for the persecution" (citing *Garcia v. Wilkinson*, 988 F.3d 1136, 1143–44, 1146 (9th Cir. 2021))).

[5] The dissent argues that "we remand decisions when the [immigration court] or BIA find a non-protected reason motivated the persecution and skip answering whether the PSG was *also* a motivation for the persecutor's conduct." But in *Mazariegos-Rodas*, a case the dissent cites for

immigrant and general evidence about a country's ability to deter those crimes." *Palucho v. Garland*, 49 F.4th 532, 536 (6th Cir. 2022). An applicant establishes that a government is unwilling or unable to control private actors "when she shows that she cannot reasonably expect the assistance of the government in controlling her perpetrator's actions." *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (citation and quotation marks omitted).

The immigration court's unwilling-or-unable analysis was fundamentally flawed. No substantial evidence can support a finding that Petitioner failed to demonstrate that he "cannot reasonably expect the assistance of the" Honduran government in controlling either Cynthia or MS-13. *Id.* The court's analysis focused largely on Petitioner's failure to lodge sufficiently detailed or frequent complaints with the Honduran police. Yet the analysis misses an important component of the threats faced by Petitioner. In November 2020, Petitioner and his wife tried to report Cynthia's threatening emails to the police, to which the police responded that "there was nothing that could be done about the incident." Admin. R., ECF No. 6-2, 397. Several days after this encounter, Petitioner and his wife were kidnapped, sexually assaulted, and shot by MS-13

---

support, the BIA affirmed the immigration judge's conclusion that the persecutors had a financial motive *and also* affirmed that the persecutors were not motivated by "animus towards the [petitioners'] family" because the persecutors "never identified the [petitioners] by name or said anything to indicate that they knew who they were or that they belonged to the Rodas[] family." 122 F.4th at 673. In other words, the BIA found a non-protected motive *and* briefly considered and rejected the alleged protected motive, determining that the former caused the persecution "rather than" the latter. *Id.* We remanded because, based on our precedent and the facts in the record, this analysis failed to consider whether the two motives were inextricably intertwined. *Id.* at 674. In this case, the immigration court's decision presents a nearly identical flaw: it found a non-protected motive (Petitioner "interfering with the criminal endeavors of Cynthia and the gang") to be the cause of the persecution rather than the alleged protected motive (Petitioner's "familial relationship to Cynthia"). Admin. R., ECF No. 6-2, 40. As in *Mazariegos-Rodas*, the immigration court did *not* consider whether laundering money through the restaurant was inextricably intertwined with persecuting the family that ran it, and remand is therefore appropriate.

gang members. During this abuse, gang members explicitly told Petitioner and his wife that "it was stupid of [them] to go to the police because the police couldn't do anything to protect [them]," and "that [MS-13] had people inside the police who told them everything and they would always find out if we reported them." *Id.* The immigration court did not reference these comments once in its unwilling-or-unable analysis. Instead, the only comment the court makes on the kidnapping incident is to note that Petitioner did not report the incident to law enforcement.

That Petitioner and his wife were abducted and harmed based on their reporting to the police is in-and-of-itself indicative of the Honduran government's unwillingness or inability to protect Petitioner. *See Portillo Flores v. Garland* 3 F.4th 615, 635–36 (4th Cir. 2021) (remanding on the unable-or-unwilling element in part because the BIA "essentially imposed a per se reporting requirement" and "ignored vital evidence favorable to Petitioner," including testimony that "reports to the local police are ineffective and can trigger retribution," and that "filing a police report can make matters worse because gang members will 'seek to obtain the name of the person who reported [their activity] via their sources within the police, government and community.'"); *cf. Hermosillo v. Garland*, 80 F.4th 1127, 1133 (9th Cir. 2023) (accepting as true the petitioner's claim that "his family did not seek further police assistance [after an initial report went nowhere] out of fear that the police would turn them over to the cartels, and that the cartels kidnapped a man who reported a car theft to the police and threatened to kill him if he complained again," the petitioner had established acquiescence).[6] The comments from MS-13 members demonstrate that Petitioner has no safe harbor with the police, as the gang has sufficiently infiltrated local police

---

[6] *Hermosillo* addressed acquiescence under CAT, but this in fact cuts in Petitioner's favor, because "the 'unable or unwilling' standard for asylum and withholding of removal is less demanding than the 'acquiescence' standard for CAT." *Mazariegos-Rodas*, 122 F.4th at 677 (gathering cases).

such that any reports by Petitioner will make their way back to MS-13. To report to the police could, in effect, be a death sentence for Petitioner. The immigration court's focus on the fact that Petitioner and his wife did not report the kidnapping is therefore wholly misplaced: as demonstrated by MS-13's comments, any attempt to report the kidnapping would have likely only resulted in further harm to Petitioner. As this Circuit has warned, "it cannot be that an applicant must wait until she is dead to show her government's inability to control her perpetrator." *Juan Antonio*, 959 F.3d at 794; *Zometa-Orellana v. Garland*, 19 F.4th 970, 980 (6th Cir. 2021) (reversing the BIA for failing to consider the petitioner's country conditions documentation that reporting domestic abuse to authorities often puts victims in danger of further violence); *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069 (9th Cir. 2017) ("Like all other circuits to consider the question, we do not deem the failure to report to authorities outcome determinative, and we consider all evidence in the record.").[7]

Additionally, the immigration court's analysis of general evidence related to Honduras' capacity to protect citizens like Petitioner is also flawed. The court found that Honduras has taken adequate steps to protect victims of gang violence because there is a large prison population in the country, many of whom are imprisoned because of gang-related activities. This, according to the immigration court, "provides significant evidence that the Honduran government is actually engaged in preventing, arresting and detaining criminal actors." Admin R., ECF No. 6-2, 43. It is not enough, however, to simply look at broad national criminal justice statistics in reviewing

---

[7] Petitioner's initial efforts to inform authorities of his persecution, as well as the grievous harms he and his wife suffered from the kidnapping that happened *because of* those reports, distinguish this case from those holding that "no government can protect its citizens from activities it is not made aware of." *Palucho v. Garland*, 49 F.4th 532, 541 (6th Cir. 2022) (quoting *Rosa-Mejia v. Garland*, 854 F. App'x 9, 14 (6th Cir. 2021)). In *Palucho*, the petitioners never contacted police, *see id.*, and in *Rosa-Mejia*, the petitioners did not contact police regarding threats from gang members until *after* they shot and killed one petitioner's husband, *see* 854 F. App'x at 14.

general evidence about a country's ability to protect its citizens. The Ninth Circuit has wisely cautioned that "high-level government efforts, however important and laudable, do not necessarily reflect low-level government actors on the ground." *Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1185 (9th Cir. 2020). The Third Circuit has also warned that where a petitioner's "past harm and fear of future harm does not relate exclusively or primarily to generalized crime," and is instead based on a "particularized harm," it is inapposite for an immigration court to only focus "on the government's efforts to combat corruption and crime generally." *Cantarero Castro v. Att'y Gen. of U.S.*, 832 F. App'x 126, 133 (3d Cir. 2020).

Petitioner has presented evidence demonstrating that, at a local level, Honduras is ill-equipped to deal with Petitioner's specific circumstances. One document Petitioner submitted is a 2020 Congressional Research Service report that explains how deeply gangs have penetrated and corrupted local law enforcement in Honduras. That study relevantly finds that corruption is endemic in Honduras and has "facilitat[ed] criminal co-option of the country's security forces." Admin. R., ECF No. 6-2, 829–30. Petitioner further presented evidence from a 2022 Overseas Security Advisory Council report showing that Honduran localities have been particularly harmed by corruption, as armed gangs often target local government actors. Another report, published in the Institute for National Strategic Studies' and the National Defense University's *PRISM* publication, notes that MS-13 has begun to focus its strategy on infiltrating local police. Finally, a 2018 study from American University notes that MS-13 has aggressively worked to "build up its arsenal, its infrastructure, its intelligence network, its relationships with local communities and its connections to authorities." *Id.* at 699. Taken as a whole, these sources reveal that local law enforcement in Honduras is particularly vulnerable to the pernicious influence of MS-13; and in fact, Petitioner's own experiences are an obvious case study in this phenomenon. This evidence

of local infiltration, which is central to Petitioner's case, was not addressed even once by the immigration court or the BIA.

### c. *Disposition*

The BIA and the immigration court erred in several important respects. As for its nexus analysis, the BIA and the immigration court failed to assess whether mixed motives played a role in Cynthia and MS-13's persecution. With regards to the unwilling or unable analysis, the BIA and the immigration court did not address Petitioner's statements on infiltration of the police, nor did it address evidence showing the systemic problem of gang corruption of local police in Honduras. This Circuit has found that "[w]hen the BIA does not fully consider an issue, as in the instant case . . . 'the proper course, except in rare circumstances, is to remand to the BIA for additional investigation or explanation.'" *Bi Xia Qu v. Holder*, 618 F.3d 602, 609 (6th Cir. 2010) (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006)). We therefore grant this portion of the petition and remand to the BIA to conduct further inquiry into Petitioner's application for withholding of removal under the INA.

### 2. Alleged Due Process Violation

"Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing." *Montanez-Gonzalez v. Holder*, 780 F.3d 720, 723 (6th Cir. 2015) (citation omitted). "To prevail on a due process challenge, an alien must demonstrate not only error, but also 'substantial prejudice,' or showing the alleged violation affected the outcome of the proceeding." *Lin v. Holder*, 565 F.3d 971, 979 (6th Cir. 2009) (citation omitted). To demonstrate substantial prejudice, the party "must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of these violations." *Abdallahi v. Holder*, 690 F.3d 467, 472 (6th Cir. 2012).

At the start of these proceedings, the immigration court conducted hearings relating to Petitioner's application and issued an oral decision. Yet the BIA remanded the case after finding that the immigration court had applied Fourth Circuit, instead of Sixth Circuit, case law. On remand, the immigration court did not hold a new hearing, nor did it allow Petitioner to present new arguments; instead, it issued a written decision that analyzed Petitioner's application under Sixth Circuit precedent. Petitioner states that the immigration court's original decision focused "almost exclusively on a failure to establish nexus to a protected ground," while the decision on remand focused on the Honduran government's capacity to protect Petitioner. Pet'r's Br., ECF No. 19, 19. Despite this alleged change in reasoning, the immigration court did not permit a new hearing or allow Petitioner to make new arguments—which, according to Petitioner, violates due process.

This argument is unavailing. Petitioner does not point to, nor are we aware of, Sixth Circuit precedent holding that a new hearing or additional briefing is constitutionally required when an immigration court's decision is remanded due to a misapplication of out-of-circuit legal standards. In fact, case law in our sister circuits suggests the opposite. In *Ke Chun Wang v. United States Attorney General*, the Eleventh Circuit considered a case where a petitioner argued that an immigration court "violated his right to due process by issuing a decision following the BIA's remand order rather than giving him an opportunity to present additional evidence." 730 F. App'x 879, 880 (11th Cir. 2018) (cleaned up). The Eleventh Circuit explicitly found that this did not constitute a due process violation, as the BIA's remand order did not require a hearing and the petitioner did not explain what new evidence he would have offered at a new hearing. *Id*. Such is the case here. The BIA did not explicitly require the immigration court to hold a new hearing and Petitioner has given no indication as to what new evidence he might have presented.

Immigration courts are also given broad leeway in how they may conduct proceedings. Federal immigration law prescribes that immigration courts may conduct proceedings as they deem necessary, and nowhere do the statutory prescriptions require hearings or opportunities for additional briefing on remand. *See* 8 C.F.R. § 1003.10(b) (". . . immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases"); 8 C.F.R. § 1240.1(a)(1)(iv) (noting that immigration courts have the authority "[t]o take any other action consistent with applicable law and regulations as may be appropriate" in removal proceedings). The immigration court did not, therefore, commit a due process violation. Accordingly, we deny this portion of the petition and affirm the BIA's findings.

### 3. ICE's Information Disclosure

In immigration proceedings, courts "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). "The Supreme Court recently held that this exhaustion requirement is not jurisdictional, but instead a claim-processing rule subject to waiver and forfeiture." *Zakariya v. Garland*, No. 23-3047, 2024 WL 869660, at *4 (6th Cir. Feb. 29, 2024) (citing *Santos-Zacaria v. Garland*, 598 U.S. 411, 417–23 (2023)). Claim-processing rules are mandatory, as courts "must enforce the rule if a party properly raises it." *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541, 549 (2019) (cleaned up).

Petitioner argues that ICE's public disclosure of Petitioner's personally identifiable information on ICE's website increases the risk of retaliatory persecution if Petitioner returns to Honduras. According to Petitioner, the BIA erroneously concluded that Petitioner failed to show a direct risk of persecution due to ICE's disclosure. Yet the government raises claim exhaustion

with respect to this argument. The government points out the specific argument that the petition advances—that the website disclosure increases the risk of persecution—is not the same argument that Petitioner made before the immigration court and the BIA. Instead, Petitioner only argued to the immigration court and the BIA that the disclosure constituted a cognizable PSG. The government's assertion is correct. There is nothing in the record showing that Petitioner made this argument to either the immigration court or the BIA. Petitioner has thus failed to exhaust his administrative remedies with respect to this issue. We therefore deny this portion of the petition.

### III.    CONCLUSION

The BIA correctly determined that the immigration court did not commit a due process violation by failing to permit additional briefing and argument on remand. Because Petitioner failed to exhaust his administrative remedies, his information disclosure argument is also precluded. However, the BIA and the immigration court both failed to properly assess Petitioner's application for withholding of removal under the INA.

For the reasons set forth above, this Court **GRANTS** the petition in part, **DENIES** the petition in part, and **REMANDS** to the BIA for further proceedings consistent with this opinion.

**HELENE N. WHITE, Circuit Judge, concurring.** I concur in Judge Clay's opinion. Additionally, I agree with Judge Nalbandian that the only CAT issue Petitioner appealed—whether he is more likely than not to be tortured if removed to Honduras—is not properly before us because the BIA affirmed the immigration judge solely on a separate issue that was not appealed—whether a government official would acquiesce to any such torture.

**NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.** I join the majority's conclusions on due process and the Immigration and Customs Enforcement information disclosure, *supra* parts II.B.2 and II.B.3. That said, because substantial evidence supports the Immigration Judge's nexus and acquiescence conclusions, I would affirm in full.

## I.

The majority aptly describes Caceres-Sanchez's circumstances. Because the standard of review can't be overstated, that's where I begin.

Our review of factual findings is "highly deferential." *Yousif v. Garland*, 53 F.4th 928, 934 (6th Cir. 2022) (internal quotation marks omitted). Under the "substantial evidence" standard, we treat the agency's findings of fact as "conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." *Id.* (internal quotation marks omitted). That's why if the decision of the Immigration Judge (IJ) is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," we will affirm. *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (internal quotation marks omitted). That also means that if the facts point in both directions, "we must defer to the agency's choice." *Yousif*, 53 F.4th at 934 (internal quotation marks omitted). We do not overturn factual conclusions just because we would have resolved the matter differently. *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008).

Our appellate review is further limited by the decision of the Board of Immigration Appeals. When the BIA issues a separate opinion instead of summarily affirming the IJ, we consider the BIA's resolution as the "final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). And where the BIA adopts the IJ's reasoning, we also review the IJ's decision. *Id.* In short, our review centers on the IJ's opinion, as supplemented by the BIA. *See Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009).

In this case, the BIA issued its own opinion. It affirmed the IJ's broad conclusions to deny relief under the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT), and in so doing, adopted both the IJ's credibility findings and its factual conclusions. But it only ratified some of the IJ's legal theories. That leaves us to review the IJ's decision, insofar as it was affirmed and supplemented by the BIA. *Yousif*, 53 F.4th at 934 (internal quotation marks omitted).

## II.

The majority disagrees with two of the BIA's factual conclusions relating to Caceres-Sanchez's withholding-of-removal claim. First, the majority holds that the BIA's no-nexus finding was erroneous—the BIA did not conduct a so-called mixed-motives analysis to understand the link between Caceres-Sanchez's persecution and his particular social group (PSG). Then, the majority concludes that the acquiescence finding was also erroneous—the BIA again allegedly dismissed evidence illustrating the Honduran government's complete unwillingness to protect Caceres-Sanchez from the persecution by MS-13. I address each in turn and explain why both of the BIA's conclusions are supported by substantial evidence.

An alien is entitled to withholding of removal under the INA if he can show a "clear probability" that if he is returned to his home country—here, Honduras—he will be persecuted on account of a "statutorily protected ground." *Umaña-Ramos v. Holder*, 724 F.3d 667, 674 (6th Cir. 2013). The risk of persecution must be "more likely than not." *Vasquez-Rivera v. Garland*, 96 F.4th 903, 907–08 (6th Cir. 2024). And he must show that his protected trait, like membership in a PSG, is "a reason" for his persecution. 8 U.S.C. § 1231(b)(3)(C). That is, he must establish a nexus between his protected trait and his persecution. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 270–73 (6th Cir. 2020). Finally, where persecution is at the hands of a private actor, he must show

that the government has "acquiesced" to this private conduct or is "unwilling or unable" to protect the alien from those private actors. *Khalili*, 557 F.3d at 436. To receive this mandatory protection under the INA, the petitioner must prove each element.

**A.**

Caceres-Sanchez claims that because the IJ did not conduct a mixed-motives analysis, the IJ's conclusion was not supported by substantial evidence.

In general, a nexus finding is one of fact that we review for substantial evidence. *See Zometa-Orellana v. Garland*, 19 F.4th 970, 976, 977–78 (6th Cir. 2021). If an agency decision is based on "flawed reasoning," it cannot be supported by substantial evidence. *Diaz-Zanatta v. Holder*, 558 F.3d 450, 454 (6th Cir. 2009) (internal quotation marks omitted). But when no such structural error occurred, our review is limited to the facts and remains deferential. Since the BIA summarily adopted the IJ's factual findings, we review both decisions. And based on the facts found by the IJ, no mixed-motives analysis was necessary.

A nexus requires that the alien's protected trait be "a reason" for his persecution. *Guzman-Vazquez*, 959 F.3d at 272. The alien carries the burden to prove, based on the "overall context" of his circumstances, that his protected trait motivated the persecution. *Sebastian-Sebastian v. Garland*, 87 F.4th 838, 847 (6th Cir. 2023) (quoting *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam)). When persecution hinges on "personal matters," the alien has failed to demonstrate this nexus. *Id.* (quoting *Zoarab*, 524 F.3d at 781). Yet, in some cases, an applicant may demonstrate that his persecution was based on "more than one factor." *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009) (internal quotation marks omitted). An alien is not precluded from withholding just because his persecutor's animus stemmed from various sources. If such motives are "inextricably intertwined," we require immigration judges to conduct a "mixed

motives" analysis. *Id.* at 998. Still, the alien's burden remains the same; he must show that a protected trait was at least "a reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

The majority concludes that the IJ committed reversible error because he did not conduct a mixed-motives analysis. On its view of the record, "the court neglected to consider" that Caceres-Sanchez's persecution was inextricably intertwined with his familial relationship with Cynthia. Majority Op. at 10. For support, it cites facts from the record which, in its view, demonstrate the IJ's errors.

This analysis has two problems. First, requiring a mixed-motives analysis when the IJ has eliminated the PSG as a reason for the persecution essentially requires that an IJ always conduct a mixed-motives analysis. Second, our cases show that not every reference to family by a persecutor demonstrates a link between persecution and the family—even when it's the PSG.

**1.**

As I read our cases, a mixed-motives analysis is required when evidence ties persecution to the protected trait, even when there is also evidence of personal animus. And we remand decisions when the IJ or BIA find a non-protected reason motivated the persecution and skip answering whether the PSG was *also* a motivation for the persecutor's conduct. *See, e.g.,* *Mazariegos-Rodas v. Garland*, 122 F.4th 655, 667 (6th Cir. 2024) ("[T]he BIA erroneously stopped short when it found one motive and prematurely ended its analysis there, ignoring the fact that a conclusion that a cause of persecution is [personal] does not necessarily imply that there cannot exist other causes of persecution." (second alteration in original) (internal quotation marks omitted)); *see also Sebastian-Sebastian*, 87 F.4th at 849–50 (6th Cir. 2023); *Al-Ghorbani*, 585 F.3d at 990.

Take *Mazariegos-Rodas v. Garland*, our most recent case on this question. Two sisters were living in Guatemala while their parents were living abroad in the United States. 122 F.4th at 660–61. Three times, gang members demanded that the older sister sell drugs for them. *Id.* at 661. The gang's first two attempts were framed as a chance for her to make money—generally extortionate. But she refused, so the gangs changed tack. The third time, the gang separated her from her sister and threatened that "they knew why [she] did not want to sell drugs—because her parents were in the United States and that her family had money." *Id.* Based on these statements, the IJ and BIA had both concluded that her persecution was only motivated by "financial gain" and was unrelated to her PSG (the Rodas Family). *Id.* at 673.

We concluded that this was error. The gang made a "notable escalation" in their tactics to recruit the older sister. The escalation of course, was that they went from offering a job to directly threatening her family. *Id.* The IJ and BIA both determined that the persecution was motivated by "financial gain," but never explained whether that was independent of, or linked to, motivation related to the Rodas Family. *Id.* And this failure was the reversible error.

That is not the case we have here. The IJ started and ended with the protected trait—Cynthia's immediate family. The IJ reviewed the evidence and concluded that, based on the circumstances, Caceres-Sanchez's persecution was not tied to the fact that they were related. Instead, all evidence pointed to the conclusion that his unwillingness to let Cynthia (and MS-13) use the restaurant to launder money was the sole motivation behind the reprisals. The IJ relied on Caceres-Sanchez's testimony that Cynthia maintained a "good relationship" with their other family members. A.R. 44. His mother and father even believed that Cynthia was joking about wanting to kill him. Most persuasive, though, was the timing: the relationship between Caceres-Sanchez

and Cynthia only soured *after* he took over managing the restaurant. Previously, according to Caceres-Sanchez, they had a "good relationship." *Id.*

The IJ both considered *and rejected* the evidence Caceres-Sanchez claims proves the PSG was a reason for his persecution. For example, he relies on the relationship between his family and the restaurant itself. His mom opened the restaurant, he took over administrative responsibilities in 2019, and both he and Cynthia worked there. He also stresses that Cynthia (and MS-13) victimized his family. She went after Caceres-Sanchez, his wife, and his eldest son, Walter. She stalked, threatened, and kidnapped Caceres-Sanchez. She hired MS-13 to kidnap and brutally rape his wife. MS-13 stalked his wife. MS-13 extorted Walter and made not-so-veiled threats that they had "information about [Caceres-Sanchez]." *Id.* at 402, ¶39–40.

Though the family was victimized, this doesn't—by itself—establish a link between the family and Cynthia's motives. A premise that's confirmed by the way Cynthia interacted with their mother. While she was running the restaurant, Cynthia and MS-13 had free rein. But after Caceres-Sanchez started investigating the books, his mom denied any problems and told Caceres-Sanchez he "shouldn't worry" about any discrepancies. *Id.* ¶16. Since 2019, she has abdicated oversight at the restaurant. Now, it's clear the restaurant is Caceres-Sanchez's alone, and only he is responsible for cutting Cynthia and MS-13 off from its laundering capabilities. While Caceres-Sanchez continues to face death threats even while in the United States, his mom remains in Honduras, untouched by either Cynthia or MS-13. In fact, Cynthia maintained a "good relationship" with his mother, so good in fact that she believed Cynthia was joking about wanting to kill Caceres-Sanchez. *Id.* at 44. All of which confirms that mom's acquiescence to Cynthia and her separation from the restaurant kept her from Cynthia's sights.

As the IJ found, the tie (their family connection) was at best superficially related to the persecution. Cynthia is willing to threaten anyone who prevents her from using the restaurant as a front for money laundering. It just so happens that, in this situation, the people keeping her from doing so were a part of her family. So once the IJ eliminated the PSG as grounds for the persecution, no additional explanation was necessary. On remand, there's nothing left for the IJ to contemplate that he hasn't already. The majority's conclusion to the contrary—that the IJ "categorically waived" away Caceres-Sanchez's evidence—illustrates that the remand is based on a factual dispute smuggled under the guise of legal error. Majority Op. at 13–14 n.3.

**2.**

The majority's logic has a second flaw. Our cases distinguish between instances when the alien offers direct evidence of a link between persecution and his PSG and instances when a persecutor's connection to the PSG is superficial. This case falls in the latter camp.

*Rodas* itself was an "unusual case" where the "persecutor expressly discuss[ed] a protected ground immediately before engaging in persecution"—the PSG, the Rodas family. *Mazariegos-Rodas*, 122 F.4th at 674. It suggested a direct link between the PSG and the persecution; exactly what's required of a nexus for withholding. Still, *Rodas* distinguished its facts from cases in which the family was a form of leverage, rather than a motivation for persecution. *Id.* (citing *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019)).

*Cruz-Guzman*, by contrast, rests on the other side of the line where the familial tie was only a means of extortion rather than itself a motivation for persecution. There, the 18th Street gang in El Salvador was extorting Cruz-Guzman's mother for protection money. *Cruz-Guzman*, 920 F.3d at 1037. After missing a payment, gang members broke into her house, beat her, and threatened to rape Cruz-Guzman's sister (her daughter). *Id.* At the same time, they made other comments

suggesting that they knew of Cruz-Guzman, they knew he was her son, and they knew that he was living in the United States. *Id.* After the attack, she fled to the United States prompting Cruz-Guzman to fear returning to El Salvador; with her gone, he feared 18th Street would persecute him for the same protection payments. *Id.*

We rejected a theory that this persecution was based on his proposed PSG, the Cruz-Guzman family. *Id.* This conduct was motivated by "basic criminality as opposed to membership in a social group or other protected status." *Id.* at 1038 (collecting cases). And as *Rodas* explained, the gang's threats during the assault—promising to rape his sister and comments about knowing his whereabouts—were "more likely an explanation for why the gang believed that the mother had the money to pay." *Mazariegos-Rodas*, 122 F.4th at 674.

*Reyes Almendarez* also falls on the *Cruz-Guzman* side of the line. The Reyes Almendarez family had endured various forms of violence at the hands of Los Tercerenos, a Honduran gang. *Reyes Almendarez v. Barr*, 817 F. App'x 35, 35–38 (6th Cir. 2020). Los Tercerenos murdered the family patriarch because he refused to comply with their extortion demands. *Id.* at 35. Los Tercerenos also threatened the family to feed the gang's members at their family restaurant. *Id.* at 36–37. And Los Tercerenos murdered a sibling after an incident at a soccer game. *Id.* at 37. The mom filed a police report, after which Los Tercerenos stalked her and issued daily threats. *Id.*

Still, the BIA concluded their asylum claim failed and we affirmed. The family had hypothesized that their relation to the now-deceased father and brother was the "genesis of Los Tercerenos's campaign against them." *Id.* at 40. But they couldn't point to any "evidence, testimonial or otherwise, that provide[d] a factual basis" for that theory. *Id.* For example, the mom received daily threats, but none concerned her husband or his relationship to her. Instead, the threats stemmed from her "filing [of] the police report," and had no connection to the family.

*Id.* And if family membership had motivated the persecution, that didn't explain why other family members who still lived in Honduras hadn't received a single threat. *Id.* For these reasons, they had not established that the "familial connection was at least one central reason" for their persecution. *Id.*

These cases make clear that each case must be taken on its facts. The mention of a family member may in some cases indicate a tie to the source of the persecution, as in *Rodas*, or it may be a form of extortion only superficially related to the persecution, like *Cruz-Guzman* and *Reyes Almendarez*. The burden remains with the IJ to distinguish between these two circumstances. Once he has done so, it may bring to light a need for further inquiry to determine whether a mixed motive is present (as in *Rodas*), or it may foreclose the claim entirely (as in *Cruz-Guzman* and *Reyes Almendarez*). I maintain that the analysis conducted by the IJ shows that this case is analogous to *Cruz-Guzman* and *Reyes Almendarez*.

At bottom, the nexus inquiry doesn't concern itself with cause, but with motive. *Cruz-Guzman*, 920 F.3d at 1037 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)). The only question, then, is whether Cynthia was motivated to attack her family, to launder money, or possibly both. The IJ's analysis began with the key fact—the relationship between the family and Cynthia's conduct. He found the two things were unrelated, and I agree. Put differently, harming Caceres-Sanchez's family was "a *means* to achieve some other goal, not an *end* in itself." *Majano-De Hernandez v. Barr*, 777 F. App'x 810, 812 (6th Cir. 2019); *see also Cruz-Guzman*, 920 F.3d at 1037–38. I would affirm.

**B.**

Caceres-Sanchez next challenges the BIA's acquiescence conclusion, alleging that the factual findings are not supported by substantial evidence. In his view, the IJ did not review the

"totality of the circumstances." Because I think the IJ's conclusions were supported by substantial evidence, I would affirm.[1]

Caceres-Sanchez was subject to persecution by a private actor. So to succeed, the government must have "acquiesced" to his persecution by MS-13 or must be "unwilling or unable" to control MS-13. *Palucho v. Garland*, 49 F.4th 532, 536 (6th Cir. 2022). This requires evidence that Caceres-Sanchez could not "reasonably expect the assistance of the government," *Juan Antonio v. Barr*, 959 F.3d 778, 793, 795 (6th Cir. 2020), or the government's "complete helplessness," in protecting him. *Palucho*, 49 F.4th at 536 (citing *Galeas Figueroa v. Att'y Gen. U.S.*, 998 F.3d 77, 87–90 (3d Cir. 2021) (collecting cases concluding "these standards are functionally identical")).

The proper scope of this inquiry is to look at the "totality of the circumstances," including "specific evidence" of the "government's response" to the crimes committed against Caceres-Sanchez, as well as "general evidence" of a country's capacity to "deter" similar crimes. *Id.* We

---

[1] Caceres-Sanchez also suggested that the BIA incorrectly reviewed the IJ's acquiescence finding de novo rather than for clear error. His theory hinges on one (admittedly) confusing statement by the BIA: "Upon [its] *de novo review* of the ultimate question whether the applicant satisfied his burden of demonstrating that the government was or would be unable or unwilling to protect him from private actors, we agree with the Immigration Judge that he did not." A.R. 9 (emphasis added). Even if this one reference—compared to the three times it mentioned clear error—revealed that the BIA reviewed the opinion de novo, at worst, it was harmless. *Abdulahad v. Garland*, 99 F.4th 275, 295 (6th Cir. 2024) (recognizing a "limited application" of harmless error in immigration cases).

Indeed, the alleged error, if anything, worked in Caceres-Sanchez's favor. Under clear error, the Board would have been tied to the factual findings made by the IJ unless obviously unsupported by the record. And close calls would have been construed in favor of the IJ's conclusion. But under de novo, the Board would not have been so limited. Thus, a loss under de novo is the best he could have hoped for. And if the BIA applied the clearly erroneous standard, no error occurred at all. A "formalistic remand" in this case "would serve little purpose." *Myrtaj v. Holder*, No. 08-3884, 2009 WL 1391530, at *6 (6th Cir. May 15, 2009); *Abdulahad*, 99 F.4th at 295 ("In other words, remand is not required when doing so would be futile." (internal quotation marks omitted)).

review the Board's findings for substantial evidence. *Ortiz v. Garland*, 6 F.4th 685, 688–89 (6th Cir. 2021).

The majority finds flaws with the IJ's analysis on both fronts—Caceres-Sanchez's specific circumstances and Honduras's general country conditions. As to the first, it holds that the IJ's analysis didn't fully contemplate the abduction as "in-and-of-itself indicative" of the government's unwillingness to protect Caceres-Sanchez. Majority Op. at 16. And, as to the second, it concludes that Caceres-Sanchez's evidence demonstrated that "at a local level, Honduras is ill-equipped to deal with" his specific circumstances. *Id.* at 18. Thus, it says, the record belies the IJ's conclusion that the Honduran government is "controlling criminal activity" and "willing[] to convict individuals accused of crimes." App. Br. at 28; *see also* Majority Op. at 14–19. But neither of these conclusions is supported by the record; as the IJ already found, the Honduran government has not acquiesced in Caceres-Sanchez's persecution by MS-13.

*Specific Circumstances.* The IJ reviewed each instance where Caceres-Sanchez went to the police for help: first, after the car crash, then, in September 2020 to report Cynthia's death threats fifteen months after they started, and a final trip within ten days of the second to follow up on the emails.

As the IJ noted, his first report lacked actionable information for the police. He told the officers about the hit-and-run but couldn't point to any witnesses, or information explaining how the officers could identify the attacker. A non-response by the police offered little insight regarding the government's acquiescence:

> At best, the police were faced with a 'hit-and-run' complaint, in a rural area, with no independent witnesses, and wherein the Respondent himself was unable to identify his alleged attacker. That the police did not conduct an effective

> investigation under these circumstances, is insufficient to establish that they were unwilling or unable to assist [him].

A.R. 45–46; *see also Galeas Figueroa*, 998 F.3d at 90 (finding BIA's conclusion supported by substantial evidence where the government's lack of success in prosecuting gang members was more likely attributable to "vagueness and deficiencies in the [alien's] police reports," than to "the government's condonation of the gang's harmful acts" especially where the reports "did not even describe the assailants").

As to the second and third reports, the only information he gave the police were emails from Cynthia, fifteen months after the threats began. Because she was living in the United States, and in an unknown place, the IJ did not think that the officers' failure to pursue an international arrest warrant revealed acquiescence either.

Important to the IJ on this point was that each report was lodged with a different police precinct. And though the first report was ignored, the second was not. A.R. at 401, ¶30. Indeed, the fact that there was a different response between the first and second trips suggests that there were police that would have (or could have) helped Caceres-Sanchez. Admittedly, this difference says nothing about whether the police effectively responded to his complaint. But knowledge of criminal operations or a criminal's conduct toward a particular individual does not therefore mean that the police have acquiesced to his torture or persecution. *Torres v. Sessions*, 728 F. App'x 584, 589 (6th Cir. 2018) ("[T]he inability of a government to control the alleged perpetrators of torture or successfully eliminate the torture is not alone conclusive of that government's acquiescence.") (collecting cases).

This is especially true in this case because the record also offers some evidence that the police served as an effective deterrent. Caceres-Sanchez testified that he was twice followed by suspected gang members but the presence of police officers deterred further harm. For example,

in one case he was threatened with a firearm, and the criminal admitted that the presence of an ongoing "police operation" in the area stopped MS-13 from following through on their threats. A.R. 46, n.8; 47. Notably, he also did not report this stalking to the police.

Finally, the police never learned of the most serious violence he faced—the kidnapping and rape. Based on this fact, the IJ found that the Honduran government was "wholly unaware" of these events and the follow-on harm he and his wife suffered. *Id.* at 47. And we have said: "No government can protect its citizens from activities it is not made aware of." *Palucho*, 49 F.4th at 541 (internal quotation marks omitted).

It's true that the totality of this evidence suggests Caceres-Sanchez had mixed success getting the police's help. But it also shows that the police were never given much of an opportunity to offer their help. And a government's conduct only crosses the line into acquiescence when it "shows willful blindness toward the torture of citizens by third parties," not just because it's "powerless to stop" that conduct. *Nerghes v. Mukasey*, 274 F. App'x 417, 424 (6th Cir. 2008) (quoting *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007)). The mere fact that the "government is unable to control the gangs does not constitute acquiescence," *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501–02 (6th Cir. 2015)—that is, a government's inability to stop every act of gang violence, "lamentable though it is, does not amount to consent or acquiescence in torture," *Majano-De Hernandez*, 777 F. App'x at 812. Thus, even with the mixed success, this record supports the IJ's thoughtful consideration of the facts pointing in both directions.

*General Country Conditions*. The IJ also noted that the Honduran government had made efforts to root out corruption from the police. And the IJ concluded that the fact that Honduran prisons are filled with tens of thousands of gang members suggested great willingness by the Honduran government to address criminal activity. At worst, the present conditions show that

work remains to be done in the campaign to improve the safety and security of Hondurans. But that does not foreclose the same, equally true statement that the government has made significant strides toward eradicating corruption, to purging the police, and addressing gang violence. *Yousif*, 53 F.4th at 938 ("[T]o the extent [the applicant] argues that the BIA should have given more weight to the 2017 State Department Reports[,] . . . those reports do not undermine the rationality of the BIA's reason for denying remand." (internal quotation marks omitted)). Or that the government is actively working to address these problems. Whether we agree with these conclusions is beside the point. As is whether Caceres-Sanchez can point to contrary record evidence. Majority Op. 18. That some evidence might point the other way doesn't undermine the IJ's conclusions. *Yousif*, 53 F.4th at 935 ("It is not enough for the alien to identify evidence that *supports* his desired factual finding; he must identify evidence that *compels* that finding." (cleaned up)).

Nor does the probability of local police corruption contradict this conclusion. As we have explained, the acquiescence question has two parts. We first look to the government's response to the applicant's persecution, and then, look to general evidence of the country's willingness and ability to prosecute similar crimes. *K.H. v. Barr*, 920 F.3d 470, 476 (6th Cir. 2019). Together, this two-pronged inquiry gives us a lens into the "overall context" both specific to the applicant and the "broader picture of the social, economic, and cultural realities of a country." *Id.* at 477. Evidence of local corruption may be relevant to a petitioner's specific circumstances because it illustrates the government's response to his harm. But to also conclude that some evidence of local corruption is itself evidence of systemic corruption, sufficient to indicate the government has acquiesced, effectively collapses these distinct questions.

Worse, in countries where efforts to solidify democratic institutions are continuing, and attempts to purge the police of bad actors are ongoing, petitioners will be able to point to evidence

that some police officer is on the take and that fact will supersede any efforts by the government to abolish such conduct. This can't be the law. The "acquiescence" and "unwilling or unable" inquiries are part-and-parcel to the central scheme of withholding of removal because petitioners are only entitled to relief where "the government [is] complicit to some degree" in his harm "through either act or omission." *Galeas Figueroa*, 998 F.3d at 86; *see also Rodas-Mendoza v. INS*, 246 F.3d 1237, 1240 (9th Cir. 2001) ("[V]iolence that the government does not sponsor and in which it is not complicit, cannot support a reasonable fear of persecution.").

This approach also suffers from a logical fallacy. Evidence of local corruption looks at whether a specific police officer is acting for his own personal gain. Whereas acquiescence is typified by, for example, a police-wide policy not to investigate crimes implicating MS-13. Though related, the theories of corruption are distinct. And for the same reason, evidence of the former does not require a conclusion that the latter is also true. If it were, then every instance of local corruption would override systemic efforts to eradicate corruption. But evidence of active efforts to control private actors is the opposite of acquiescence. So in a case like this one, where the record amply supports the proposition that there are system-wide efforts to eradicate corruption and purge the police of bad actors, some evidence of local corruption cannot override the Honduran government's efforts to stop persecution by non-government actors like MS-13.

If a government is willing and able to afford even *some* protection from harm inflicted by private actors, then "that government is *not sufficiently complicit* in the conduct for those acts to constitute persecution" for the INA or the CAT. *Galeas Figueroa*, 998 F.3d at 90 (emphasis added).[2] So even acknowledging MS-13's power in Honduras and their possible infiltration of the

---

[2] The unable-or-unwilling test gets at this core principle by requiring that the "feared harm be inflicted by forces that the government is unable or unwilling to control." *Galeas Figueroa v. Att'y Gen. U.S.*, 998 F.3d 77, 88 (3d Cir. 2021) (emphasis omitted) (internal quotation marks

local police in Caceres-Sanchez's case, he hasn't shown that the police were unwilling and unable to protect him: they tried to respond after his second trip to the police. On the ground, the mere presence of officers deterred MS-13 from causing Caceres-Sanchez grievous injury. And the failure to respond to Caceres-Sanchez's first trip to the police is just as explicable by the dearth of information he gave them. *Id.*

Perhaps "some corrupt officials may turn a blind eye" to gang activity in Honduras, but "rather than being willfully blind" to the violence they breed, and the torture they carry out (as the IJ explained and as the evidence substantially supports), the Honduran government "actively combats and prosecutes [gang] activity." *B.R. v. Garland*, 26 F.4th 827, 845 (9th Cir. 2022).

## III.

Caceres-Sanchez's final challenge is to his denial of CAT relief. To succeed under the CAT, the applicant bears the burden of proving that it is "more likely than not" he will be tortured if removed. 8 C.F.R. § 1208.16(c)(3). This requires proof both that he was subject to torture and that the government was either responsible for the harm or acquiesced in its infliction. *Id.* § 1208.18(a)(1), (a)(7). Caceres-Sanchez has only appealed the BIA's decision about his potential for future torture. In his view, the analysis was flawed because the IJ "fail[ed] to perform a comprehensive review of all potential sources of torture," and did not conduct the required "aggregation" analysis. App. Br. at 37–38; *see also id.* at 38–39; *Abdulahad v. Garland*, 99 F.4th 275, 290 (6th Cir. 2024).

This question however is not properly before us because the BIA did not address this question in its opinion. The BIA only affirmed the IJ's CAT conclusion on the acquiescence

---

omitted). And the complete-helplessness test looks to whether the government "condoned the private actions or at least demonstrated a complete helplessness to protect the victims." *Id.* (internal quotation marks omitted).

finding. A.R. 11 ("[W]e agree with the Immigration Judge's ultimate determination that the applicant did not meet his burden of proving that a government official will more likely than not acquiesce to any torture the applicant fears upon return to Honduras."). The BIA retains discretion in how it affirms IJ decisions. *Chen v. BIA*, 435 F.3d 141, 144 (2d Cir. 2006). And how the BIA exercises this discretion "affect[s] the scope of our review." *Id.* When the BIA affirms the IJ's decision in almost all respects, we review the IJ's decision *as modified by the BIA*—that is, "minus the single argument for denying relief that was rejected by the BIA." *Id.* (internal quotation marks omitted). Because the BIA only adopted the IJ's acquiescence finding, that is the only basis for appellate review.

## IV.

For the foregoing reasons I would **AFFIRM** the decision of the BIA and **DENY** the petition for review.